**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Renee T. Kraft, | ) | |
| | ) | |
| Plaintiff, | ) | **ORDER RE DEFENDANT'S MOTION** |
| | ) | **FOR SUMMARY JUDGMENT** |
| vs. | ) | |
| | ) | |
| Mike Johanns, Secretary of the | ) | Case No. 1:04-cv-084 |
| United States Department of Agriculture, | ) | |
| | ) | |
| Defendant. | ) | |

_____

Before the court is defendant's Motion for Summary Judgment, which was filed on September 2, 2005. For the reasons set forth below, the motion is granted in part and denied in part.

I.    **BACKGROUND**

A.    **Factual History**

Kraft worked for the Farm Service Agency ("FSA"), a part of the defendant United States Department of Agriculture ("USDA"), as a program assistant/program technician for over seventeen years before retiring on disability in November 2000. See Defendant's Statement of Material Facts, Ex. 1 ["Transcript of Kraft's Deposition, pp. 24-25"]. She suffers from Anxiety Disorder, Attention Deficit Hyeractivity Disorder, and dyslexia. Id. at pp. 10-12; see also Plaintiff's Statement of Material Facts, Exs. 35 and 40. The record reflects that, at the time of her retirement, she was in her early fifties. See Transcript of Kraft's Deposition, pp.11-12.

On August 5, 1992, Kraft first applied for disability retirement. See Plaintiff's Statement of Material Facts, ¶ 4; see also Plaintiff's Statement of Material Facts, Ex. 34. Her application was denied in the spring or summer of 1993. See Plaintiff's Statement of Material Facts, Ex. 34. Shortly

thereafter she was transferred from the FSA's office in Sioux County to its office in Morton County. See id., see also Plaintiff's Statement of Material Facts, ¶ 4.

According to Kraft, her condition, when coupled with changes in the workplace, made it difficult for her to focus on her assigned tasks. See Complaint, p. 5. She asked to be moved to a more secluded workspace and later requested that partitions or acoustical panels be erected around her desk to minimize distractions. See id. The FSA allegedly balked at her requests, however. See id.

On July 9, 1999, Kraft filed an informal complaint against the FSA with EEO Counsel David White. See Transcript of Kraft's Deposition, p. 33; see also Plaintiff's Statement of Material Facts, ¶ 6. In her complaint she alleged that she "was discriminated against on the basis of Reprisal, Age (November 29, 1948), Mental Disability, and Issues Harassment/ non sexual and Term/Condition of Employment." Defendant's Statement of Material Facts, Ex. 11.

Kraft was asked to submit a written request for reasonable accommodations. See Plaintiff's Statement of Material Facts, ¶ 8. Consequently, on August 20, 1999, her psychologist submitted an outline of specific accommodations to the USDA on her behalf. See Plaintiff's Statement of Material Facts, Exs. 36 and 40.[1]

Kraft reportedly met with her supervisor, County Executive Director Jean Schoenhard, on September 14, 1999, to report that staff had shunned her and that the Union Steward had been "tracking her every move." Plaintiff's Statement of Material Facts, ¶ 9. In any event, she "accepted

---

[1] Dr. Ed Kehrwald, a psychologist with the West Central Human Service Center, had written to Jean Schoenhard on July 9, 1999, at Kraft's request to advise Schoenhard of Kraft's condition. See Plaintiff's Statement of Material Facts, Exs. 36 and 40. On July 22, 1999, Dr. L. Olson wrote the following prescription: "Recommended accommodation for Renee to have less noise and distraction at the work site such as screens or partitions." Id. On August 20, 1999, Dr. Kehrwald wrote a letter to the USDA on Kraft's behalf discussing what the USDA could do to accommodate Kraft both in terms of her physical workspace as well through interpersonal communication. See id.

the early resolution program and extended the FSA's deadline for 60 days to schedule mediation." Id. at ¶ 10.

A mediation hearing was held on October 5, 1999, at which Kraft appeared with her attorney, Isabella Robertson.  See Plaintiff's Statement of Material Facts, Ex. 1 [Affidavit of Isabella Robertson].  According to Robertson, the parties discussed several possible accommodations, including the replacement of the door to the office's computer room.  Id.  According to Kraft, she was informed by EEO Counselor White prior to the mediation hearing that she would be forced into retirement if she did not accept the partitions offered by the FSA.  See Plaintiff's Statement of Material Facts, ¶ 10.

The parties executed a settlement agreement on October 5, 1999.  See Plaintiff's Statement of Material Facts, Ex. 27.  Under the terms of the agreement, the FSA was to:

> 1.  Provide sensitivity training to all employees in the Morton County FSA office within six months of the date of the settlement agreement.
>
> 2.  The County Executive Director, Ms. Jean Schoenhard, will meet with Kraft to discuss FSA procedures for promotion to the CO-7 level within 30 days of the date of the settlement agreement.
>
> 3.  Provide 2 plexiglass, acoustical partitions around Kraft's desk within 60 days of settlement agreement.  A third partition will be provided, if requested by Kraft to the County Executive Director, Ms. Jean Schoenhard, within 60 days of the date of the request for the third partition.
>
> 4.  Pay [Kraft] the sum of $650.00 (six hundred and fifty dollars).  The parties agree that this sum represents a total and complete settlement of all money issues payable to Kraft or her attorney in this matter.

Id.  In return, Kraft agreed to:

> 1.  Withdraw the informal EEO Complaint #ND99-001-E initiated on July 9, 1999; and agree not to raise any new complaint about the above cited issue(s).

3

Id.  Finally, both parties agreed to respect each other's privacy and not to disclose the explicit terms of their agreement.  Id.  Conspicuously absent from the agreement was any reference to the computer room door.  Nevertheless, Robertson insists that the parties verbally agreed that the FSA would replace this door.  See Plaintiff's Statement of Material Facts [Affidavit of Isabella Robertson at ¶¶ 13-15].

On November 4, 1999, Ms. Schoenhard met with Kraft to discuss the FSA's promotion procedures.  See Plaintiff's Statement of Material Facts, Ex. 27.  That same day the FSA ordered two plexiglass partitions for Kraft's workspace.  See id.

Kraft called Russell Bubach, State Administrative Officer, on November 30, 1999, to voice her concern that the partitions ordered by the FSA "were not acoustical."  See id.  According to Kraft, Bubach was dismissive and insisted that the partitions were satisfactory.  See id.

The partitions arrived on November 26, 1999, and were installed on December 3, 1999. They proved to be ineffective, however.  See id.; see also Plaintiff's Statement of Material Facts, Ex. 32.  Kraft claims that Bubach advised her on December 16, 1999, that the FSA would reorder the partitions.  See Plaintiff's Statement of Material Facts, Ex. 27; see also Complaint, p. 7.  Kraft also claims that, on January 24, 2000, she contacted Bubach to discuss the status of  the new plexiglass partitions she believed had been reordered and was informed they had yet to be reordered. See id.

The agency decided against ordering additional plexiglass partitions concluding that they would not solve the noise problem.  Instead, the agency installed two cloth partitions on each side of  Kraft's workstation leaving the plexiglass partitions in the front to maintain Kraft's line of sight. See id.; see also Plaintiff's Statement of Material Facts, Ex. 32; Defendant's Statement of Material

4

Facts, Ex. 13 [Affidavit of Scott B. Stofferahn, ¶¶ 6 and 7].  According to Kraft, although the cloth partitions improved things, it still was not enough; Kraft claims the cloth partitions helped minimize visual distractions but were too short and did not provide sufficient "acoustical control."  See Plaintiff's Statement of Material Facts, Ex. 27.

On February 3, 2000, Schoenhard again met with Kraft, this time to discuss Kraft's work performance.   Kraft described the meeting and its aftermath as follows:

> On this same date, Ms. Schoenhard requested a counseling session with Ms. Kraft which served to create a hostile environment.  Starting on December 28, 1999, all of the work was evaluated with a high error rate resulting. Ms. Kraft was told that she had to have a screening for the Employee Assistance Program [EAP].  Ms. Schoenhard stated that if there were things that Ms. Kraft had not conveyed to Ms. Schoenhard or the administration about any additional problems, that Ms. Kraft needed to go to counseling.  Ms. Kraft called EAP; EAP replied to Ms. Kraft's request by saying that she was only a mandatory referral.  Ms. Kraft was told by EAP that she would have lost her job if she had not called.  This job action occurred less than two (2) months after a job performance evaluation that reflected positive results and no "no achieved" notations on any criteria necessary for the performance of her position.  Ms. Kraft was later informed that her referral was NOT mandatory.

Plaintiff's Statement of Material Facts, Ex. 28; see also Complaint, p. 9 (alleging that her work received greater scrutiny after she reported the FSA's alleged noncompliance with the initial settlement agreement to an EEO counselor/mediator).   Kraft left later that day complaining of a headache and called in sick the following day.  See Plaintiff's Statement of Material Facts, Ex. 27; see also Defendant's Statement of Material Facts, Ex. 14 [Affidavit of Jean Schoenhard].

On Saturday, February 5, 2000, Kraft went into work to, in her words, get her medication and check her calendar.  See Plaintiff's Statement of Material Facts, Exs. 27 and 34.  On Monday, February 7, 2000, Kraft's psychologist contacted Kraft's supervisors to inform them that Kraft was taking an indefinite leave of absence for health reasons.  Kraft never returned to work.  She again

submitted an application for disability retirement in May or June of 2000, which was approved by the Office of Personnel Management ("OPM") in November 2000.

Schoenhard had planned to meet with Kraft on Tuesday, February 8, 2000.  In anticipation of this meeting she drafted a memorandum advising that disciplinary action would be recommended if Kraft continued to work outside scheduled work hours without prior authorization.  See Plaintiff's Statement of Material Facts, Ex. 27.[2]

On March 3, 2000, Kraft and her attorney faxed a Complaint on Breach of Settlement Agreement to the USDA's Director of Complaints Compliance Division, Office of Civil Rights and the next day forwarded the original by express mail.  In the complaint, Kraft detailed the breaches he claims the USDA had committed including, *inter alia*, that she had been harassed by office staff,[3] that the partitions ordered by the FSA were inadequate, and that the FSA had not replaced the door to the computer room as she thought had been agreed upon.  See Plaintiff's Statement of Material Facts, Exs. 27 & 28.  Notwithstanding this letter, the FSA provided sensitivity training to all of its Morton County employees on March 23, 2000, pursuant to the terms of the parties' settlement agreement.  See Plaintiff's Statement of Material Facts, Ex. 2 (Affidavit of Darrell W. Farland).

Meanwhile, Kraft also submitted a thirty-page complaint dated March 18, 2000, to EEO Counselor David White in letter form.[4]  Kraft alleged that she had been subjected to a hostile work

---

[2]   Kraft, in a document dated January 4, 2001, denied that she had been working outside of office hours and asserted that Schoenhard's memorandum only served to illustrate how hostile the work environment had become.  See Plaintiff's Statement of Material Fact, Ex. 34.

[3]   Kraft repeatedly alluded to growing animosity amongst the staff.  Specifically, she has complained that co-workers belittled her partitions, constantly tossed mail over her partitions and onto her desk, and on occasion referred to her as "wop," "honky," and  "the menopausal queen."  See Plaintiff's Statement of Material Facts, Ex. 34.

[4]   According to an EEO counselor's report (dated May 17, 2000), Kraft contacted the EEOC on March 2, 2000, and was interviewed by an EEO counselor on March 13, 2000.  See Plaintiff's Statement of Material Facts, Ex. 36. During her interview, she claimed that "she was involuntarily forced to leave her place of employment on February 3,

environment, harassed for non-sexual reasons, discriminated against on the basis of her age and disability, and retaliated against for filing her initial EEO complaint.  See Plaintiff's Statement of Material Facts, Ex. 35.[5]

On April 5, 2000, Kraft received a Notice of Right to File Formal Complaint from the EEOC. See Plaintiff's Statement of Material Facts, Exs. 35 and 36.  The following day Scott Stofferahn, State Executive Director, sent a letter to Kraft advising her that the FSA had completed its obligations under the parties' settlement agreement.  See Defendant's Statement of Material Facts, Ex. 22; see also Plaintiff's Statement of Material Facts, Ex. 32.  On April 14, 2000, Kraft's attorney responded to Stofferahn by letter, alleging that the FSA had breached the parties settlement agreement, to wit: (1) it had not provided the agreed upon acoustical partitions; (2) it had violated her right to privacy by disclosing the contents of her medical records to her co-workers; and (3) had made her the target of ridicule.  See Plaintiff's Statement of Material Facts, Ex.  32.

On April 17, 2000, Kraft filed a formal complaint of discrimination[6] with the EEOC wherein she stated:

> The issues alleged are [sic] in this Complaint are whether the complainant was harmed by a hostile work environment, age discrimination, medical and mental disability accommodation, EEO accommodation discrimination, reprisal, and the issues from the original complaint filed on July 9, 1999, which has been reopened due to breach of contract.  The reprisal is in response for an EEO complaint.

---

2000, due to a hostile environment and has not returned."  Id.  Resolution was not achieved during the informal counseling phase.  A final interview was conducted on March 31, 2000.  Id.

[5] Kraft submitted an affidavit wherein she provided a detailed chronology of the events she believed gave rise to her various harassment, reprisal, discrimination, and hostile work environment  claims. See Plaintiff's Statement of Material Facts, Ex. 34.

[6] Attached to the complaint were several documents, including an eleven-page missive dated April 12, 2000, and captioned "Formal Complaint for Renee Kraft."  See Plaintiff's Statement of Material Facts, Ex. 27.

The complaint of hostile work environment and reprisal based on disability, accommodation presented and documented with the following:

throwing mail over the partitions, derogatory references to your disability, refusal to give you information on promotions, rifling your desk, shunning, inferiority status, segregation, communication barriers, exclusions of qualifications for grade increases, stereotypical assumptions, failure to cooperation with modifications and accommodations, withholding of education and training, lack of good faith in supplying accommodations and supporting good communication efforts.

See Plaintiff's Statement of Material Facts, Ex. 27.

The USDA's Office of Civil Rights later contacted Kraft via letter dated June 21, 2000, informing her that it was investigating her claim that the FSA failed to fully implement the terms of the parties' settlement agreement.  See Plaintiff's Statement of Material Facts, Ex. 32.  On June 30, 2000, Deborah Lombardino, Acting Director, Civil Rights and Small Business Utilization Staff, Office of the Administrator, responded to Kraft's April 14th letter addressed to Stofferahn.  Therein she denied that the agreement had been breached.

On August 23, 2000, Kraft filed a Complaint for Injunctive Relief with this court, asserting that the FSA had refused to produce all of the correspondence she had previously requested.  See Plaintiff's Statement of Material Facts, Ex. 21; see also Kraft v. FSA Administrator, North Dakota FSA, Case No. A1-00-108, Docket No. 1.  The FSA filed a Motion for Dismissal, which the court granted on January 29, 2001. See Kraft v. FSA Administrator, North Dakota FSA, Case No. A1-00-108, Docket No. 6.

On July 30, 2001, the FSA submitted to the EEOC a Motion to Dismiss those claims related to events that had occurred prior to the execution of the parties' settlement agreement.  See Defendant's Statement of Material Fact, Ex. 8.  On August 9, 2001, Robertson submitted a response

describing in detail the basis for Kraft's breach of contract claim. <u>See</u> Defendant's Statement of

Material Facts, Ex. 7.

On August 15, 2001, EEO Administrative Law Judge (ALJ) Ronald J. Tanaka issued a

memorandum wherein he stated the following with respect to the FSA's Motion to Dismiss:

> It is [Kraft's] theory that all issues should be reinstated which were closed by the Settlement Agreement. The Agreement stated that the request to reinstate those issues or enforce the terms of the Agreement "must be filed within 30 days of the alleged failure to implement this Agreement with the Director, Complaint Compliance Division, Office of Civil Rights, Room #607, 300 7th Street SW, Washington, D.C.
>
> It is my interpretation of the Agreement and based on my experience with other such agreements that [Kraft] needed to notify the [FSA's] Complaint Compliance Division that the Agency breached the Agreement. There is nothing to indicate that [Kraft] contacted the Complaint Compliance Division regarding breach of the Agreement. Instead, on April 14, 2000, [Kraft's] attorney wrote Scott B. Stofferahn, State Executive Director, Fargo, North Dakota, regarding the breach of the Agreement. On June 30, 2000, Deborah Lombardino, Acting Director, Civil Rights and Small Business Utilization Staff, Office of the Administrator, Fargo, North Dakota, responded denying any breach of the Agreement.
>
> By not contacting the Complaint Compliance Division, as set forth in the Agreement, regarding the breach of the Agreement, [Kraft] did not notify the appropriate Agency officials. Second, if Lombardino's response was appealable, which is questionable since she did not communicate with the Complaint Compliance Division, Complainant did not appeal her decision to the EEOC's Office of Federal Operations which would then have jurisdiction over breach of settlement agreements.
>
> I find [Kraft] did not notify the appropriate Agency officials of the alleged breach of the Agreement nor was it appealed to the OFO. Other than [Kraft's] statements there is nothing such as an OFO ruling that the Agency breached the Agreement. Therefore, I rule as follows:
>
> > 1.   I deny [Kraft's] request to reinstate any issues which occurred prior the agreement
>
> * * *

      3.      I will not hear any issues which deal with the breach of the Agreement since there are other mechanisms in place to deal with breaches of settlement agreements. . . . .

See Defendant's Statement of Material Facts, Ex. 8.  Next, he stated that a hearing regarding the remaining issues raised in Kraft's complaints would be held on September 11, 2001.  Id.

Prior to the scheduled hearing, the parties entered into a second settlement agreement dated September 4, 2001, that purported, at least at that time, to resolve all of the outstanding issues, except for Kraft's claims regarding breach of the first settlement agreement.  In the second settlement agreement, the FSA agreed to:

      a.      Promote [Kraft] to a CO-7/5 effective March 30, 1997, with back pay through November 3, 2000, date of [Kraft's] disability retirement. [Kraft] will be granted a Within-Grade-Increase to a CO-7/6 effective April 11, 1999.  All applicable deductions will be deducted from the back pay as prescribed by procedure.  FSA will process the necessary personnel actions within 30 days from the date of this agreement.  All leave taken between February 3, 2000, and November 3, 2000, will remain as annotated on Kraft's T&A's. [7]

      b.      Process the necessary paperwork to pay a lump sum amount of $15,000 (fifteen thousand) to [Kraft] within 30 days from the date of the signing of this Agreement.  The payment will not be subjected to withholdings by the Agency, however, an IRS form 1099 will be issued to [Kraft].

      c.      Process necessary paperwork to pay reasonable and customary attorney's fees pursuant to 29 C.F.R. § 1614.501(e) within 30 days from the date of receipt of an itemized bill from [Kraft's] counsel.

See Defendant's Statement of Material Facts, Ex. 12.  The person signing the agreement on the behalf of the FSA was Jean Freeman, an employment relation specialist from Washington, D.C.

In return, Kraft agreed to:

---

[7] "T&A's" are time and attendance sheets maintained for FSA employees.

a.      Hereby withdraw her EEO Complaint No. Cr-000504 and EEOC Case No. 320-AO-8383X, and any other pending appeals complaints grievances, civil actions, or any other claims regarding her employment with the FSA, except the allegation of a breach of the Settlement Agreement dated October 5, 1999.

b.      File no new appeals, complaints, grievances, civil actions, or any other claims regarding the claims at issue in this complaint, except for the "breach" issue listed in "a" above.

c.      Release the USDA, the [FSA], their employees and officers in their official capacities from any and all claims relating to the events which gave rise to the complaint that is the subject of this agreement, except for the "breach" issue listed in "a" above.

Id.[8]

The state agency processed the paperwork necessary to secure a check from the National Finance Center ("NFC") for back pay for the period of March 30, 1997, through October 9, 1999, and a check in the amount of $2,644.69 was issued by the NFC on September 29, 2001.  See Defendant's Statement of Material Facts, Ex. 10.  Apparently, the state agency was not able to process a check for the rest of the back pay for the period from October 9, 1999, to November 3, 2000, because the payroll-processing function had shifted in October 1999 to the NFC. Consequently, the NFC had to calculate the amount of the check for this period and then issue it. See Plaintiff's Statement of Material Facts, Ex. 43. On October 27, 2001, Kraft received a lump sum payment of $15,000 from the FSA per the parties second settlement agreement.  See Plaintiff's Statement of Material Facts, Exs. 54 and 64.

Kraft's attorney wrote Jean Freeman on November 16, 2001, expressing concern that the only thing that Kraft had received as of that date was a check in the amount of $2600 with no

---

[8]  The entire settlement agreement includes additional provisions that make it compliant with federal statutory requirements, which is discussed in more detail later herein.

indication of what the check covered.  <u>See</u> Plaintiff's Statement of Material Facts, Ex. 52.  It is not clear whether Freeman responded to this letter.  However, Freeman sent Kraft's attorney a fax on January 15, 2002, with an attached e-mail from Jennifer Broin of the state FSA office to Neota Hall at FSA headquarters, which described the problems the state office was having in processing the second back pay request through the NFC to cover the time period from October 9, 1999, to November 2000.  The e-mail stated the necessary information had been sent several times, but payment had not yet been made. <u>See</u> Plaintiff's Statement of Material Facts, Ex. 42.

Kraft's attorney responded to Freeman's fax communication with a letter sent by fax dated January 16, 2002.  In that letter, Kraft's attorney noted that the USDA was overdue in its performance and requested that it act with all deliberate speed.  <u>See</u> Plaintiff's Statement of Material Facts, Ex. 42.  On the bottom of the copy of the letter from Kraft's attorney that appears to have come from FSA's files, there is a handwritten note that states: "Talked to Brenda - she will eliminate LWOP today & call me tomorrow."  As discussed in more detail later herein, Kraft contends this handwritten note is evidence that she would receive full back pay through November 3. 2000, and that there would be no deduction for any time she was counted by the USDA as being on leave without pay.   <u>See</u> Plaintiff's Statement of Material Facts, Ex. 43.

Also, on January 16, 2002, Neota Hall at FSA headquarters responded to the e-mail from Jennifer Broin of the state FSA office of the previous day.  In that e-mail, Hall suggested  language that Broin should use in preparing the payment request to obtain proper processing.  For the period from 3/20/00 to 11/3/00, Broin suggested using the following language:

> 3/20/00 through 11/3/00: Due to settlement agreement, LWOP for this time period is being cancelled.  Please issue check for 40 hours the week of 3/20/00 through 3/24/00 (second week of pay period), and 80 hours per pay period thereafter, at rate

of C0-7 step six.  Please pay lump sum annual leave earned from 3/20/00 through 11/3/00.

Id.

It appears that, while the foregoing exchanges were taking place, the NFC processed the second back pay check on or about January 7, 2002, in the amount of $919.83.  See Defendant's Statement of Material Facts, Ex. 10.  It is undisputed that the amount of this check included deductions for "leave without pay" that Kraft contends was contrary to the second settlement agreement.

On March 4, 2002, Kraft's attorney wrote Freeman requesting approximately $10,000 in back pay for leave taken by Kraft between February 3, 2000, and November 3, 2000.  See Defendant's Statement of Material Facts, Ex. 9; see also Plaintiff's Statement of Material Facts. Ex. 65.  Freeman responded on March 6, 2001, rejecting this request and stating in part:

> Ms. Kraft will not receive any payment for the period of February 3, 2000, through November 3, 2000, as it was agreed to that "All leave taken between February 3, 2000, and November 3, 2000, will remain as annotated in the Complainant's T&A's."  The leave taken between these dates is "Leave Without Pay," therefore, no payment will be made for this period."

Defendant's Statement of Material Facts, Ex. 10.  It added that the paperwork necessary to effectuate Kraft's promotion had been completed, that Kraft had received $15,000 as agreed upon, and that it had processed the paperwork regarding Kraft's attorney's fees.  See id.

On September 28, 2002, Kraft sent a letter to the Office of Civil Rights, contending the FSA had not complied with the parties' second settlement agreement.  See Plaintiff's Statement of Material Facts, Ex. 68.  In addition, on November 2, 2002, Kraft wrote a letter to David Winningham, Director of the Office of Civil Rights, alleging that the FSA failed to comply with the terms and conditions of the second settlement agreement.  See Plaintiff's Statement of Material

Facts, Exs. 26 and 53. Carol Fields, Chief of the Employment Compliance and Technical Assistance Division, responded to these allegations in a letter dated January 30, 2003, advising Kraft that the Office of Civil Rights was conducting an inquiry into the matter, that the FSA had been directed to submit responses to each of Kraft's allegations, and that a determination would be forthcoming. See Plaintiff's Statement of Material Facts, Ex. 52.

On December 26, 2002, the United States Department of Agriculture ("USDA") issued its Final Administrative Decision on an Allegation of Noncompliance with respect to the parties first settlement agreement (Complaint No. ND-99-001-E). It concluded that the FSA had substantially complied with the terms of the settlement agreement and that no further action was required. See Defendant's Statement of Material Facts, Ex. 22 [Department of Agriculture (USDA) Final Administrative Decision on an Allegation of Noncompliance]; see also Plaintiff's Statement of Material Facts, Ex. 25. In relevant part, the USDA concluded:

> The simplest matter to address is the replacement of the computer printer room door. This is not addressed in the Settlement Agreement at issue and, as noted above, the intent of the parties must be expressed in writing with sufficient specificity to be plainly understandable. Discussions about other remedies that are not memorialized in the written agreement may not be the basis for a breach of the Settlement Agreement claim. Therefore, the complainant has no claim as to the computer printer room door.
>
> Next, there is the matter of the promised partitions. These were provided in a timely fashion and the Agency records indicate the partitions were installed on December 3, 1999. Contrary to the complainant's attorneys claim, the partitions were purchased from Advance Office Concepts. Also, the documentation and letters clearly indicate the Agency's concern as to the noise reduction coefficient of these partitions. That they may not have been effective does not mean that the Agency did not meet the terms of the Settlement Agreement. Further negotiations with regard to what noise reduction partitions would provide the desired accommodation may have needed to take place, but the Agency acted in good faith in providing what was asked for and agreed to in the Settlement Agreement.

14

Moreover, as the complainant has been retired since November 2000, the problem of the correct accommodation is moot, as the complainant no longer requires an accommodation. Since the complainant settled a subsequent complaint for money damages as well as retirement assistance, it is to be presumed that she was no longer looking for an accommodation that would allow her to continue to perform the essential functions of her position.

* * *

Finally, the complainant claims her privacy was breached in contravention of the Settlement Agreement provision. However, the complainant has provided no specifics in support of this claim. The Agency, in what appears to be a response to this claim with a fax date of July 19, 2000, states that "the complainant's" medical condition was not discussed with any of the staff in Morton County. Staff employees are going to begin to draw their own conclusions when partitions start going up around an individual's desk and employees are required to attend sensitivity training. Many questions were asked of management regarding these issues. The County Executive Director refused to give specific information in fear of violating the complainant's privacy . . . .

As the complainant has provided no specifics of the alleged breach, the provision required the Agency to not divulge explicit terms of the Settlement Agreement. The Agency states it did not divulge that information. The matters referred to by the complainant's attorney are merely assertions that this information was divulged. The heart of the complaint is that other employees, in spite of the sensitivity training provided to them as required by the Settlement Agreement, allegedly ridiculed the complainant's condition and/or accommodation provided to it. Without evidence indicating that such behavior (giving it the best interpretation available to the complainant, which is that it occurred) was linked to management's breach of the complainant's privacy, there is no reason to draw a conclusion that the Agency did divulge protected information.

Id.

On June 20, 2003, the USDA issued its Final Administrative Decision on an Allegation of Noncompliance with respect to the parties' second settlement agreement. See Plaintiff's Statement of Material Facts, Ex. 53. Again, it concluded that the FSA had substantially complied with the terms of the parties agreement and that no further action was required. Id.

We find that the Agency has substantially complied with the terms of Item 1 in the Settlement Agreement. The Agency provided documents to show that it timely

15

requested NFC to calculate monies owed the complainant.  The Agency has also provided documents to show that the "AD-343" for the complainant's back pay was calculated by the State Office (period of 3/30/97 through 10/9/99) for a net payment of $2,644.69 which was processed by NFC on September 29, 2001.  Also, an AD-343 for back pay calculated by NFC (period 10/9/99 through 11/3/00) for a net payment of $912.82 was processed by NFC on January 7, 2002.  The Agency provided documentation that the annuity payment for the complainant as to a CO-7/5 was processed by OPM on January 27, 2003.  As a result of this payment the complainant has been paid all monies owed, and the annuity payment is correct.

The Agency complied with the Settlement Agreement and processed the leave as it was marked on the complainant's T&A for the period of February 3, through November 3, 2000.  The leave taken between those dates was "Leave Without Pay," therefore no payment was made for the period.  Which is in compliance with the terms of the Settlement Agreement.

Id.

On February 1, 2003, Kraft filed a notice of appeal of the USDA's Final Administrative Decision with the EEOC.  See Plaintiff's Statement of Material Facts, Ex. 24.  She followed this up with a letter dated February 27, 2003.  Therein, she claimed that the FSA had breached the parties initial settlement agreement in that it (1) neither purchased nor provided acoustical partitions by the agreed upon deadline; (2) failed to respect her privacy; (3) broke its promise to reorder the partitions; (4) falsified compliance reports; and (5) ignored her requests to reinstate her initial complaint.  See Plaintiff's Statement of Material Facts, Ex. 7.  Additionally, she claimed that the FSA had breached the parties' second settlement agreement to the extent that it had failed to file the paperwork necessary to effectuate her retroactive promotion.

On February 6, 2004, the EEOC denied Kraft's appeal of the USDA's Final Administrative Decision and affirmed the USDA's finding that the FSA had not breached the parties' initial settlement agreement.  See Plaintiff's Statement of Material Facts, Ex. 4 (EEOC Decision, Appeal No. 01A31848, Agency No. ND-99-001-E).

16

With respect to the plexiglass partitions, the agency ordered two such partitions on November 9, 1999, which were received at the facility on November 26, 1999. It was not until after the partitions were installed that the parties discovered that plexiglass was an inadequate noise-reducing material. Once the problem was discovered, the agency attempted to remedy the situation by arranging for cloth panels to be placed around complainant's work area as a supplement to the plexiglass panels, in order to help reduce the noise level. The record establishes that the agency acted in good faith when it purchased the plexiglass panels and when it tried to fix the sound proofing problem that became apparent afterward. Complainant has not presented any evidence that plexiglass panels with sufficient noise-reducing properties were available for the purpose intended by the settlement agreement. The Commission finds that the agency acted in good faith in complying with provision 3 of the agreement. Therefore, we find that the agency sustantially complied with provision 3 of the agreement.

As to her claim that the agency breached the privacy provision in the settlement and otherwise acted in bad faith, complainant failed to present any persuasive evidence that any confidential matters were disclosed to unauthorized persons. Finally, with respect to the claim regarding the door to the computer room, the settlement agreement contains no language requiring the agency to replace that door.

Therefore, we find that complainant has not shown that the agency breached the settlement agreement.

The Agency's decision finding no breach of the settlement agreement dated October 5, 1999, is AFFIRMED.

Id.

On February 11, 2004, the EEOC denied Kraft's appeal of the USDA's Final Administrative Decision and affirmed the USDA's finding that the FSA had not breached the parties' second settlement agreement. In relevant part, the EEOC concluded as follows:

The record includes complainant's retirement records attached to a cover memorandum dated September 28, 2001. These records indicate that complainant received a promotion to CO 7/5, effective March 30, 1997, and that she received a within grade increase to CO 7/6, effective March 28, 1999. This information was forwarded to the Office of Personnel Management for recalculation of complainant's annuity, which was accomplished on November 23, 2001. By memorandum dated December 19, 2001, the Office of Personnel Management notified complainant that it had re-computed her annuity based upon the information that it had received from the agency. Moreover, complainant acknowledged on appeal that on October 5,

2001, she received a check from the agency in the amount of $2,644.69. A payroll action request form dated September 26, 2001, established that this amount represented the net back pay owed to complainant between March 30, 1997, and March 20, 2000. An SF-50 dated March 20, 2000, indicated that complainant remained in leave without pay status from March 21, 2000, until her retirement on November 3, 2000. Complainant has not clearly articulated or shown how the agency has failed to comply with any of the terms in provision (a) of the September 4, 2001 settlement agreement. Even if the agency did not comply within the 30 day time limit, we find that the agency has now complied and that there was no bad faith by the agency. Therefore, we find that the agency has substantially complied with provision (a) of the agreement.

The agency's decision finding no breach of the settlement agreement dated September 4, 2001, is therefore AFFIRMED.

Defendant's Statement of Material Facts, Ex. 25.

On March 9, 2004, Kraft submitted a letter requesting reconsideration of the EEOC's February 6, 2004, decision. <u>See</u> Plaintiff's Statement of Material Facts, Ex. 3. The EEOC denied her request on March 23, 2004. <u>See</u> Plaintiff's Statement of Material Facts, Ex. 3 (Denial of Request for Reconsideration, Appeal No. 01A31848). The following day it denied her request for reconsideration of its February 11, 2004, decision. <u>See</u> Attachment to Complaint [EEOC Decision, Appeal No. 01A34682, Agency No. CR-000504].

### B.   Procedural history

Kraft initiated this action on June 25, 2004, asserting that she was "misled and deceived" into signing the settlement agreements. (<u>See</u> Docket No. 1). Her complaint consists of a lengthy narrative, the gist of which is that the FSA did not comply with the terms of the parties' settlement agreements to the extent that it did not provide her with reasonable workplace accommodations, failed to respect her privacy rights, discriminated against her on the basis of her age and disability during the term of her employment, and incorrectly calculated her back pay, which in turn led to a miscalculation of her retirement benefits. (<u>See</u> <u>id.</u>). She requests (1) a review of the EEOC claims

process; (2) an order compelling the FSA to adhere to the settlement agreements the parties executed on October 5, 1999, and September 4, 2001; and (3) redress with respect to her complaints of discrimination.  (See id.).  By separate order, the court is permitting Kraft to amend her complaint to revise her claims for relief.

On September 2, 2005, the USDA filed a Motion for Summary Judgment or, in the alternative, Motion for Bifurcation.  (See Docket No. 31).  In support of its motion the USDA argues the following:

1. Kraft had not properly exhausted her administrative remedies.

2. Kraft waived her claims of discrimination when she executed the settlement agreements.

3. Kraft is precluded from seeking rescission of the settlement agreements by virtue of the fact that she has failed to return the considerations she received pursuant to the agreements.

4. The USDA fully complied with the terms of the settlement agreements thereby precluding any reinstatement of Kraft's underlying discrimination, harassment, and retaliation claims.

5. Kraft has not stated a claim upon which relief can be granted.

(See id.).

On October 31, 2005, Kraft filed a response to the USDA's Motion for Summary Judgment.  (See Docket No. 49).  Among other things, she claims that she exhausted her administrative remedies and questions the validity of the releases contained in the settlement agreements.  Reiterating her claims of breach, she accuses the USDA of falsifying documents to give the appearance of compliance.  In addition, she claimd she was induced into signing the settlement agreements through fraud, undue means, and duress. As for any suggestion that she return

consideration received from the USDA, she maintaind that tender back is not required in this case if she is allowed to rescind the agreements.  (See id.)

On January 20, 2006, the court held a hearing on the USDA's Motion for Summary Judgment.  AUSA Cameron Hayden appeared on the USDA's behalf.  Kraft appeared *pro se.*

On January 25, 2006, Kraft filed a document captioned "supplemental responses to hearing." (See Docket No. 58)  On February 1, 2006, the USDA filed a supplemental materials in support of its Motion for Summary Judgment detailing the manner in which Kraft's back pay and annuity had been calculated.  (See Docket No. 59)

On February 27, 2006, Kraft filed additional supplemental materials as well as a response to supplemental materials filed by the USDA on February 1, 2006, wherein she disputed the USDA's computation of her back pay and annuity.  (See Docket Nos. 61 and 63)

## II.   DISCUSSION

### A.    Standard of review

It is well-established that summary judgment is appropriate when, viewed in a light most favorable to the non-moving party, there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law.  Fed.R.Civ.P. 56(c); Graning v. Sherburne County, 172 F.3d 611, 614 (8th Cir. 1999).  A fact is "material" if it might affect the outcome of the case and a factual dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

The basic inquiry for purposes of summary judgment is whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.  Quick v. Donaldson Co., Inc., 90 F.3d 1372, 1376 (8th Cir. 1996).

The moving party has the initial burden of demonstrating to the Court that there are no genuine issues of material fact. If the moving party has met this burden, the non-moving party cannot simply rest on the mere denials or allegations in the pleadings. Instead, the non-moving party must set forth specific facts showing that there are genuine issues for trial. Fed.R.Civ.P. 56(e). A mere trace of evidence supporting the non-movant's position is insufficient. Instead, the facts must generate evidence from which a jury could reasonably find for the non-moving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).

### B.    Law governing disputes involving settlement agreements

Settlement agreements are a species of contract. Consequently, in the absence of particular statutory requirements, general contract principles govern the resolution of disputes involving settlement agreements. See e.g., United States v. ITT Cont'l Baking Co., 420 U.S. 223, 238 (1975); Myers v. Richland County, 429 F.3d 740, 745 (8th Cir. 2005); Bernabucci v. Huber, 2006 ND 71, ¶ 15, __ N.W.2d __ (2006).

### C.    Plaintiff's claims for rescission and reinstatement of claims

Kraft seeks to rescind both the 1999 and 2001 settlement agreements so she can prosecute the underlying civil rights claims. In focusing upon Kraft's claims for rescission and reinstatement, it is important not to lose sight of the forest for the trees.

Essentially, what happened in this case was that Kraft was in the process of administratively prosecuting claims for violation of her civil rights when she entered into the first settlement agreement in 1999. Not long afterwards, she claimed the USDA breached the first settlement agreement and committed additional violations of her rights. While she was in the process of seeking to rescind the first settlement agreement and prosecute all of her claims administratively

(both those released by the first settlement agreement and those allegedly occurring thereafter), the parties entered into a second settlement agreement that settled all of Kraft's claims, except for her right to pursue a breach of the first settlement agreement. Kraft insisted that the latter be kept open, but there was no agreement regarding what relief she would be entitled to receive, if any, if she proved a breach of the agreement.

Given the fact the second settlement agreement is the more comprehensive, it will be addressed first in terms of Kraft's claims for rescission.

### 1.   Claim for rescission of second agreement based on fraud

Kraft claims she has been the victim of fraud, principally with respect to the first settlement agreement. To the extent Kraft claims fraud with respect to the second settlement agreement, she has failed to submit proof sufficient to withstand the USDA's motion for summary judgment. For example, there is no submissible evidence supporting Kraft's assertion that the USDA entered into the second settlement agreement not intending to perform it. At most, Kraft has proved there are disputed fact with respect to whether the USDA fully performed the agreement. This alone, however, is not enough to prove fraud. P.L.A.Y., Inc. v. NIKE, Inc., 1 F.Supp.2d 60, 65-66 (D.Mass. 1998); see generally 17A Am.Jur.2d Contracts § 569.[9]

### 2.   Claim for rescission of second agreement based on undue influence, duress, and failure to comply with statutory requirements

Kraft claims violations of a number of civil-rights statutes, but her principal claims are of violations of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. §§ 621, *et seq.*, and

---

[9] North Dakota law is the same. See e.g., Kary v. Prudential Ins. Co. of America, 541 N.W.2d 703, 705 (N.D. 1996); Bourgois v. Montana-Dakota Utils. Co., 466 N.W.2d 813 (N.D. 1991); N.D.C.C. §§ 9-03-08.

the Rehabilitation Act, 29 U.S.C. §§ 791, *et seq*.  See e.g., Plaintiff's Statement of Material Facts,

Ex. 39 [USDA Investigation Report of EEOC Complaint].

Releases of ADEA claims are governed by the Older Workers Benefit Protection Act

("OWBPA").  Enacted in 1990, the OWBPA amended the ADEA by providing that "[a]n individual

may not waive any right or claim under [the ADEA] unless the waiver is knowing and voluntary."

29 U.S.C. § 626(f)(1).  Oubre v. Entergy Operations, Inc., 522 U.S. 422, 427 (1998).  Under the

OWBPA requirements relevant to this case, a waiver will not be considered knowing and voluntary

unless:

1. the waiver is part of an agreement between the individual and the employer that is written in a manner calculated to be understood by such individual, or by the average individual eligible to participate;

2. the waiver specifically refers to rights or claims arising under this chapter;

3. the individual does not waive rights or claims that may arise after the date the waiver is executed;

4. the individual waives rights or claims only in exchange for consideration in addition to anything of value to which the individual already is entitled;

5. the individual is advised in writing to consult with an attorney prior to executing the agreement; [and]

6. the individual is given a reasonable period of time within which to consider the settlement agreement.

29 U.S.C. § 626(f)(1)-(2).  These are minimum requirements and the burden of proving compliance

is upon the employer. E.g., Thomforde v. International Business Machines Corp., 406 F.3d 500, 503-

505 (8th Cir. 2005); 29 U.S.C. § 626(f)(3).

The release contained in the second settlement agreement meets these minimal requirements

in that it is (1) clear and understandable to a person of average abilities; (2) refers to rights or claims

under the AEDA; (3) does not purport to waive post-release claims; (4) provides consideration for the release over and above that to which Kraft was already entitled (e.g., a retroactive raise in grade and pay); and (5) advises in writing that the person signing should consult an attorney.  See Defendant's Statement of Material Facts, Ex. 12.  Finally, with respect to whether the time period for consideration of the release was sufficient, Kraft indicated during the hearing before the court that the release was negotiated over a two-day time period.  Under the circumstances, this was not an unreasonable amount of time, particularly given that Kraft was represented by counsel and there had already been a number of communications between the USDA and either Kraft or her counsel regarding the dispute.  In fact, this was the second settlement agreement covering, in part, the same subject matters.

Further, apart from the minimum statutory requirements, Kraft's work experience, education, and attention to detail are sufficient to warrant the conclusion that she grasped the import and consequence of the release.  Further, Kraft was an active participant in the negotiations.  For example, it was at her insistence that the release did not cover claims for breach of the first settlement agreement.  Finally, and perhaps most importantly, Kraft was represented by counsel and there is nothing that indicates that either Kraft or her counsel were, in anyway, overwhelmed by agency personnel.

Consequently, regardless of whether one applies a "totality of the circumstances" test or general common law principles,[10] and even assuming the burden remains with the defendant, the

---

[10] In Thomforde v. International Business Machines Corp., supra, the Eighth Circuit left open the question of what test applies to determine whether a release of ADEA was made knowingly and voluntarily after the court determines whether or not the minimum statutory requirements have been met.  The court stated in relevant part the following:

> [W]e need not decide the proper test to apply to determine whether the waiver was also knowing and voluntary. Compare Ulvin v. Northwestern Nat'l Life Ins. Co., 943 F.2d 862, 866 & n. 4 (8th Cir.1991) (applying contract principles to pre-OWBPA waiver), cert. denied, 502 U.S. 1073, 112 S.Ct. 970, 117

material undisputed facts indicate that Kraft executed the second settlement knowingly, voluntarily, and upon advice of counsel.  See, e.g., Ulvin v. Northwestern National Life Ins. Co., 943 F.2d 862 (8th Cir. 1991); Equal Opportunity Commission v. American Home Products Corp., 144 F.Supp.2d 1084 (N.D. Iowa 2001); cf. Thomforde v. International Business Machines Corp., 406 F.3d at 503-505; Kronebusch v. Lettenmaier, 311 N.W.2d 32 (N.D. 1981).

"Public policy favors the enforcement of settlement agreements containing release language that is unambiguous." Joe v. First Bank System, Inc., 202 F.3d 1067, 1070 (8th Cir. 2000).  In this case, while there is an ambiguity in one part of the settlement agreement, there is no ambiguity with respect to the release language.  Based on the record before the court, there is no basis for rescission of the second settlement agreement based upon Kraft's claims of undue influence, duress, or violation of law.

### 3.    Claim for rescission of second agreement based on alleged breaches

Finally, Kraft claims she is entitled to rescission based upon the USDA's alleged breaches of the second settlement agreement.  However, under ordinary contract principles, not every breach of contract will support a claim for rescission.  In particular, rescission is not appropriate when the performance by the breaching party has been substantial and there has not been a total failure of consideration.  See, e.g., P.L.A.Y., Inc. v. NIKE, Inc., 1 F.Supp.2d at 65 (recession for failure of consideration permitted under Massachusetts law when the failure goes to the essence of the agreement but is not available when the defaulting party's performance has been substantial); see

_____

L.Ed.2d 135 (1992), *with Bennett v. Coors Brewing Co.*, 189 F.3d 1221, 1228-29 (10th Cir.1999) (holding that even if statutory requirements are met, courts must inquire into totality of the circumstances to determine if waiver was knowing and voluntary). We leave that discussion for another day.
406 F.3d at 505 n2.

generally 17Am.Jur.2d Contracts §§ 578, 631; 17B C.J.S. Contracts §§ 456, 477; Farnsworth on Contracts § 4.11 (3rd ed. 2004; cf. Realex Chemical Corp. v. S.C. Johnson & Son, Inc., 849 F.2d 299, 302-303 (8th Cir. 1988) ("Substantial performance occurs where less than full and exact performance is rendered, but where there is, nevertheless, sufficient performance to allow the breaching party the benefit of the bargain.") This is basic hornbook law.[11]

In this case, following execution of the second settlement agreement, Kraft was given a retroactive increase in grade and rank; she was paid separate lump-sum amounts for back pay and a cash settlement amount; she was paid attorney fees; and she was given retroactive adjustments in grade and rank  that were used to increase the effective amount of her disability annuity, at least in substantial part.  In comparison, the alleged items of  non-performance are a much smaller part of the bargained-for performance.  And, of these items, the most significant relates to an ambiguity in the settlement agreement that the USDA denies constitutes an obligation.

Thus, there is no question about the fact the USDA's performance has been substantial and that there has not been a total failure of consideration.  Further, Kraft has other remedies available to her (including, as appropriate, damages and specific performance) that will give her the benefit of her bargain should she be successful in proving that the USDA has breached the settlement agreement. For these reasons, the court concludes that the equities preponderate against allowing Kraft to rescind the second settlement agreement and in favor of limiting her to her other remedies.

The USDA asserts that Kraft cannot challenge the releases, rescind the settlement agreements, and proceed with her underlying discrimination claims unless and until she tenders back

---

[11]  North Dakota law is the same. Schaff v. Kennellly, 61 N.W.2d 538, 544-545 (N.D. 1953); Langer v. Lemke, 49 N.W.2d 641, 648 (N.D. 1951) ("A mere dispute regarding an incidental portion of a contract which involves only the payment of money does not justify rescission.")

the considerations she received following the execution of both settlement agreements.  For support, it relies principally upon the holding in <u>Fleming v. United States Postal Service AMF O'Hare</u>, 27 F.3d 259, 260-261 (7th Cir. 1994).

The extent to which a plaintiff seeking to vindicate statutorily-protected civil rights should be required to tender back any considerations received by settlement before seeking rescission is the subject of substantial disagreement.  Some courts hold that there is no reason not to apply generally accepted common law principles requiring tender back, while other courts suggest that rigidly applying tender back requirements defeats the remedial purposes of the federal civil rights statutes. <u>Compare</u> <u>Fleming v. United States Postal Service AMF O'Hare</u>, <u>supra</u>; <u>with</u> <u>Long v. Sears Roebuck & Co.</u>, 105 F.3d 1529, 1541-42 (3d Cir. 1997) (noting cases in which tender back was not required in the context of federal remedial statutes); <u>Cole v. Gaming Entertainment, L.L.C.</u>, 199 F.Supp.2d 208 (D. Del. 2002) (opining that the tender back doctrine should be inapplicable to federal remedial statutes such as Title VII); <u>Rangel v. El Paso Natural Gas Co.</u>, 996 F.Supp. 1093, 1098 (D.N.M. 1998); <u>cf.</u> <u>Brown v. City of South Burlington, Vermont</u>, 393 F.3d 337 (2nd Cir. 2004).  Also, there is authority for a court being able to render judgment granting rescission conditioned upon restitution being made in a reasonable amount of time.  <u>Farnsworth on Contracts</u> § 4.15 & n.20 (3rd ed. 2004).

In addition, the Supreme Court in <u>Oubre v. Entergy Operations, Inc.</u> held that an employee is not required to tender back considerations received in an ADEA case when the release fails to meet the minimum statutory requirements for voluntariness under the OWBPA.  And, while there is language in <u>Oubre</u> that suggests that tender back is only excused when it conflicts with the OWBPA's statutorily imposed requirements (522 U.S. at  428), there is other language discussing

27

the fact that tender back, either prior to or at the initial commencement of the litigation, was not always required at common law ( Id. at 426) intimating that tender back may not be required in other situations, as well.

In this case, the second settlement agreement purports to release Kraft's claims under the ADEA. Consequently, there are substantial questions as to whether Oubre applies beyond the facts of the case and to releases that do not violate the OWBPA's requirements[12] and whether, as a more general matter, application of rigid tender-back requirements is appropriate in cases in which federal statutory civil rights are involved given the remedial nature of the statutes.[13]

It does not appear that the Eighth Circuit has weighed in on these issues. And, given the court's ruling that Kraft should not be allowed to rescind given the substantiality of the USDA's performance, the court need not address the USDA's defense of failure to tender back.

### 4. Claim for rescission of first settlement agreement

The only thing that Kraft can gain if rescission is granted with respect to the first settlement agreement is reinstatement of the claims settled by the first settlement agreement. However, these same claims were again released by the second settlement agreement and she obtained considerations under the second agreement that clearly are reflective of that fact. Consequently, with the court's ruling that the second settlement agreement must stand, Kraft's claims for rescission of the first settlement agreement are moot.

---

[12] See Long v. Sears Roebuck & Co., 105 F.3d 1529, 1548 (3rd Cir. 1997) (Greenberg, J., dissenting) (suggesting that tender back can still be required in an ADEA case when the basis for rescission is failure of consideration and not the violation of the OWBPA voluntariness requirements).

[13] Under North Dakota law, N.D.C.C. § 9-09-04 requires, in most cases, an offer of restoration of consideration prior to rescission and a demonstrated ability to make restoration prior to equitable relief being granted. E.g., West v. Carlson, 454 N.W.2d 307, 309 (N.D. 1990); Wook v. Kuhn, 221 N.W.2d 65, 69 (N.D. 1974). But, in cases of personal injury, N.D.C.C. § 9-08-09 abrogates the restoration requirement in certain instances and allows the breaching party only the right of offset or recovery by way of counterclaim.

Further, this is not inconsistent with the language that keeps open the possibility of Kraft being able to pursue a claim for breach of the first settlement agreement. The clear intent of the second settlement agreement is to comprehensively settle all of Kraft's underlying civil rights claims in the context of her taking a disability retirement. In settling these claims, but reserving the right to pursue a breach of the first settlement agreement, Kraft simply took rescission and restoration of the underlying claims off the table, leaving her with the opportunity of collecting damages, if any, that may have directly flowed from the breach of the agreement as opposed to the underlying claims that were released.

### 5. Conclusion regarding Kraft's claims for rescission

Based on the foregoing, the court concludes Kraft is not entitled to rescind either the 1999 or the 2001 settlement agreements. Consequently, the USDA is entitled to summary judgment of dismissal of Kraft's claims for rescission of the two agreements.

### D. Kraft's claims for breach of the second settlement agreement

Generally speaking, federal common law governs the interpretation of a contract to which the United States is a party and takes into account the best law as set forth in modern decisions of the federal and state courts. United States of America v. Basin Electric Power Cooperative, 248 F.3d 781, 796 (8th Cir. 2001); A.W.G. Farms, Inc. v. Federal Crop Ins. Corp., 757 F.2d 720, 726 (8th Cir.1985); Ambur v. United States, 206 F.Supp.2d 1021, 1026 (D.S.D. 2002).

There is some tension in the cases applying federal common law as to how willing a court should be to look beyond the agreement in determining whether an ambiguity exists. Some courts take the position that, as a matter of normal course, a court should consider the circumstances in which the agreement is made, the interpretations proffered by the parties, and, on a conditional basis,

the extrinsic evidence proffered by the parties to support their interpretations.  See, e.g., In re New Valley Corp., 89 F.3d 143, 149-150 (3rd Cir. 1996); see generally 11 Williston on Contracts § 30:5 (4th ed.); Farnsworth on Contracts §§ 7.10-7.14 (3rd ed. 2004).[14]  For other courts, the primary focus is upon the language of the agreement, and how that language would be understood in its ordinary and popular sense, and matters outside the agreement (particularly extrinsic evidence of prior negotiations) should be looked to only in limited situations, such as when it is clear the parties intended the language to be understood in a technical sense or when there is evidence of a "latent ambiguity."  See, e.g., Air Line Pilots Ass'n, Intern. v. Midwest Exp. Airlines, Inc., 279 F.3d 553, 556 (7th Cir. 2002); Funeral Financial Systems v. U.S., 234 F.3d 1015, 1018 (7th Cir.2000).[15] Obviously, the latter approach allows summary judgment to be granted in more cases.

In the more recent cases in which the Eighth Circuit has applied federal common law, it has tended to follow the more expansive approach, at least to the extent of considering evidence of the surrounding circumstances and the interpretations that have been proffered by the parties.  See, e.g., United States of America v. Basin Electric Power Cooperative, 248 F.3d at 804-805;  John Morrell & Co. v. Local Union 304A of United Food and Commercial Workers, AFL-CIO, 913 F.2d 544, 551 (8th Cir. 1990).[16]

---

[14]  The use of extrinsic evidence to determine whether there is an ambiguity does not mean that the evidence can later be used to vary the terms of the agreement if the court determines the agreement to be unambiguous. See, e.g., Brobeck, Phleger & Harrison v. Telex Corp., 602 F.2d 866, 871-872 (9th Cir. 1979) (under California law, extrinsic evidence should be considered conditionally to determine whether an agreement is ambiguous, but may not be used to vary the terms of the agreement if it is found to be unambiguous).

[15]  The North Dakota Supreme Court appears to follow a more restrictive approach to consideration of matters outside the agreement  for the purpose of determining whether an agreement is ambiguous. E.g., Bernabucci v. Huber, 2006 ND 71, ¶ 15, __ N.W.2d __ (2006);  Kaler v. Kramer, 603 N.W.2d 698, 702 (N.D. 1999).

[16]  In this case, it is not possible to fully understand the second settlement agreement without giving some consideration to the evidence of the surrounding circumstances.  For example, the term in the agreement "T&A's" requires some explanation that is not contained within the "four corners of the agreement."   The same is true with

**1.    Claim of failure to pay all the back pay allegedly agreed upon**

Before turning to the language of the second settlement agreement, it is necessary to provide some context in terms of the events leading up to the execution of the agreement.

Soon after execution of the first settlement agreement, Kraft complained that the accommodations the USDA agreed to provide were not in keeping with the agreement and were not working.   Kraft's last day of actual work was on February 3, 2000.  On February 7, 2000, Kraft's psychologist informed Kraft's supervisors that Kraft was taking an indefinite leave of absence for health reasons.

Kraft never returned to work.  She submitted an application for disability retirement in May or June of 2000, which was approved by the Office of Personnel Management ("OPM") in November of 2000.  She also pursued administrative claims for breach of the first settlement agreement along with claims that the USDA had committed additional violations of her civil rights. More particularly, she claimed that the USDA's failure to provide her with the necessary accommodations for her disabilities, a hostile work environment, and USDA's retaliatory actions following execution of the first agreement forced her to take a disability retirement and also deprived her of increases in grade and pay that she would have earned prior to that time.

There is some confusion in the record regarding what happened after Kraft's last day of work on February 3, 2000.  It appears the USDA continued to pay Kraft until on or about March 19, 2000, based on accumulated sick and annual leave time and that she was not paid for the period from on or about March 19, 2000, to November 2000 when her disability retirement was approved and she began collecting monthly disability payments that were 40% of her calculated retirement annuity.

_____

respect to why certain dates were included in the agreement with respect to the payment of back pay.

This was the context in which the parties then, almost a year later, entered into the second settlement agreement on September 4, 2001.

One of the provisions of the second settlement agreement was that the USDA would give Kraft a retroactive promotion and pay her back pay consistent with that promotion through the time of her disability retirement in November 2000. Specifically, the relevant language provided that the USDA would:

> Promote Complainant to a CO-7/5 effective March 30, 1997, with back pay through November 3, 2000, date of Complainant's disability retirement. Complainant will be granted a Within-Grade-Increase to a CO-7/6 effective April 11, 1999.

However, the agreement also provided that:

> All leave taken between February 3, 2000, and November 3, 2000, will remain as annotated on Complainant's T&A's [time and attendance sheets].

Kraft states her understanding of the foregoing provisions was that she would receive back pay through November 3, 2000, as the first clause states. She claims that the second clause regarding leave annotated on the T&A"s was inserted only for the purpose of allowing the USDA to offset the amount she had been paid for the period from February 3, 2000, to March 19, 2000, for her accumulated sick and annual leave time, so that she would not be double compensated. From Kraft's perspective this was consistent with her assertions that the USDA was responsible for her not working up to the time she took a disability retirement because of its failures to live up to the terms of the first settlement agreement and otherwise provide her the accommodations necessary to deal with her disabilities.

The USDA contends, however, that the second provision was included so that Kraft would not be entitled to compensation for the time she was on "leave without pay." From the USDA's perspective, this was consistent with its belief that Kraft left work on February 3, 2000, due to no

fault of the USDA's and should not be compensated from that point to when her disability retirement was approved.

There appears to be no dispute about the fact that Kraft was not paid back pay for at least the period after March 19, 2000, to the time of her disability retirement. It is not clear whether she received back pay to cover the increased amounts due as the result of the retroactive promotion for any pay she may have received for the period from February 3, 2000, to March 19, 2000.

In this case, looking only to the actual language of the contract, the undisputed evidence regarding the circumstances in which the agreement was made, and the interpretations proffered by the parties, it is apparent the language in question is susceptible to multiple reasonable interpretations. The extrinsic evidence that has been proffered , which will be discussed later, simply reinforces the conclusion that the language is ambiguous.

Focusing on the language of the agreement, the first clause, which states that Kraft would receive "back pay through November 3, 2000," plainly would create an obligation to pay back pay through November 3, 2000, absent other limiting language. Consequently, the question is whether the second clause takes away what appears to have been promised by the first clause.

The second clause provides that "all leave" taken between February 3, 2000, and November 3, 2000, "will remain as annotated" on Kraft's time and attendance sheets. But, what does "remain as annotated" mean, particularly in the context of the earlier language stating that back pay would be paid through November 3, 2000? Does it mean, as the USDA suggests, that "leave without pay" during this time period will not be compensated even though the language does not explicitly say that? Or does the language serve some other rationale purpose consistent with payment of back pay through November 3, 2003, as Kraft suggests?

Construing both clauses together, one rationale interpretation, which favors Kraft, is that back pay would be paid through November 3, 2000. The second clause, instead of taking away what was promised by the first, merely eliminates the possibility of Kraft later coming back and claiming she was entitled to both back pay through November 3, 2000, and additional compensation for accumulated annual and sick leave that Kraft claims she was forced to take as result of USDA's actions. In other words, the purpose of the language stating that the leave "would remain as annotated" on the T&A's was to insure that any leave taken during that time frame would remain counted as having been used and would not be restored by the language of the first clause promising back pay through November 3, 2000. This interpretation would give effect to all of the language and is also consistent with the absence of explicit language stating that Kraft would not be compensated for the time prior to November 3 that she was on leave without pay.

Another rationale interpretation, which also favors Kraft, is that the Kraft would be paid back pay through November 3, 2000, as indicated by the first clause, and that the second clause was inserted only to make clear that the USDA was entitled to offset "all leave" for which Kraft had already been paid, *i.e.*, both annual and sick leave.

Still another rationale interpretation is the one offered by the USDA, which is that the parties intended that back pay would be paid generally through the date of Kraft's disability retirement of November 3, 2000, but all leave taken, whether earned or unearned, would either be deducted from what was to be paid or not counted.

Having concluded that the language is susceptible to multiple reasonable interpretations and is, for this reason, ambiguous, the court then looks to the extrinsic evidence that has been proffered. In that regard, Kraft offers the following extrinsic evidence supporting her interpretation:

1.    Kraft claims that, during a conference call with USDA Jane Freeman prior to execution of the second settlement agreement, she was told she would receive back pay through November 3, 2000, and that the only thing that would be offset would be what she was paid during the time she was on annual or sick leave.

2.    Following the second settlement, there was a delay in the USDA attempting to make payment for the period from October 9, 2000, through November 3, 2000.  Kraft's attorney wrote USDA employment specialist Jean Freeman in Washington about the delay on January 16, 2002, and faxed the letter the same day.  Kraft has submitted what she claims is a copy of the letter written by her attorney that she received from the USDA that has a handwritten note on the bottom that reads: "11/6/02 Talked to Brenda - she will eliminate LWOP today and call me tomorrow." Id.  Kraft asserts that Freeman made this notation and that "LWOP" was her shorthand reference for "leave without pay."  Based simply on what appears on the document, this is not an unreasonable inference, particularly in the context of the next item of evidence.

3.    Kraft also submits a copy of an internal USDA e-mail that was exchanged between Jennifer Broin and Neota Hall, with a copy to Jean Freeman.  This exchange indicates that Broin contacted Hall about problems she had encountered when calculating Kraft's back pay for the period between October 10, 1999, and November 3, 2000.  See id.  In response, Hall advised Broin as follows:

> NFC will compute the amount paid, but they need more specific information about what happened that was shown on your -343.
> (You may need to attach a sheet to explain the details).
>
> Suggested wording for -343 is as follows:

"Due to EEO settlement agreement, please pay employee retroactive pay at rate of CO-7 step 6 (equivalent to GS-7 step 6) from 10/10/99 through 11/3/00 as follows:

10/10/99 through 3/19/00: Employee was paid at CO-6 step 7. Needs to receive additional pay to account for retroactive promotion to CO-7 step 6 for this time period. Please also adjust lump sum payment for annual leave to account for retroactive promotion.

3/20/00 through 11/3/00: *Due to settlement agreement, LWOP for this time period is being cancelled. Please issue check for 40 hours the week of 3/20/00 through 3/24/00 (second week of pay period), and 80 hours per pay period thereafter, at rate of C0-7 step six. Please pay lump sum annual leave earned from 3/20/00 through 11/3/00.*

Please submit a supplemental SF-2803 Retirement Record to OPM."

Id. (emphasis added)

4.     The USDA forwarded a proposal dated July 30, 2001, to the EEOC to resolve Kraft's complaints of breach of the first settlement agreement and her additional civil rights claims. The proposal contains language indicating that the USDA was prepared to promote Kraft with back pay through November 3, 2000, with no mention of any offsets or conditions. (Ex. 58)

The USDA did not offer any explanation for this extrinsic evidence other than its proffer of what it believes to be the proper interpretation of the language in question.

Based on the foregoing, the court concludes there are material facts in dispute with respect to what was intended by the second settlement agreement in terms of compensation for the period from February 3, 2000, and November 3, 2000, and whether or not the USDA fully performed its

obligations with respect to the payment of back pay.  Cf. Owens v. West, 182 F.Supp.2d 180, 195-197 (D.Mass. 2001).  Consequently, this is one reason why the government is not entitled to summary judgment with respect to Kraft's claims that the USDA has breached the second settlement agreement.[17]

> **2.    Claim that the alleged failure to recognize the promotion through the agreed-upon period negatively impacted the calculation of Kraft's retirement annuity**

The calculation of Kraft's retirement annuity (which is the basis for her disability annuity) was based, at least in part, upon her "high-3" average pay.  As the court understands it,  "high-3" average pay is the highest average basic pay an individual earns during any three consecutive years of service.  Based on the record before the court, it appears the computation was "weighted"  based on the amount of time during the three-year period that particular levels of wage were in effect.

Kraft argues that, in addition to not being fully compensated for the back pay she claims she was entitled to for the period from February 3, 2000, to November 3, 2000, the salary she should have received through November 3, 2000, was not fully credited in the calculation of her retirement annuity based on the information supplied by the USDA to OPM.  In other words, instead of the calculation using the last three years leading up to November 3, 2000, the three-year calculation looked back from an earlier date and, as a consequence, included months in which she was earning

---

[17]   The foregoing discussion assumes that all of the T&A's in existence at the time of the second settlement agreement were marked as indicated by the USDA.  However, the court has been unable to unearth the actual T&A's in all of the material submitted to it to see how the T&A's were marked.  Consequently, this also remains a fact to be proved, particularly since there is some discrepancy in the record as to what may have actually been marked on the T&A's.  At several points in the record, the USDA asserts that all of the time after February 3, 2000, was marked "leave without pay" on the T&A's, but this does not seem to make sense if, in fact, the USDA continued to pay Kraft until on or about March 19, 2000.  Further, Ex. 70 attached to Plaintiff's Statement of Material fact seems to indicate that the T&A's were marked to reflect the expenditure of sick or annual leave for part of the period following February 3, 2000.  Whether Exhibit 70 is a partial T&A, or whether it is nothing more than a handwritten summary of information purportedly taken from the T&A's, is not clear.

a lesser wage, thereby reducing the amount of her base annuity from which her disability annuity is now being calculated. Also, Kraft argues that any COLA increases that were given during the excluded period were also not counted.

Based on the record, there is some evidence that supports Kraft's claim that she was not credited for all, or part of, the time period from February 3, 2000, to November 3, 2000, in the calculation of her retirement annuity based on information supplied by the USDA to OPM. Although the record is far from clear, it appears the USDA takes the position that Kraft was not entitled to be credited for any time she was on leave without pay in terms of the calculation of her retirement annuity. However, as noted above, there are material disputed facts regarding whether Kraft should have been paid back pay during the time period that the USDA considered her to be on leave without pay. Also, based on the language of the settlement agreement, there appears to be a question regarding whether Kraft should have received credit for the period through November 3, 2000, in terms of the calculation of her retirement annuity, regardless of the fact that offsets were made for pay purposes during the period from February 3, 2000, to November 3, 2000, for authorized and unauthorized leave.[18]

Based on the foregoing, the court concludes there are material facts in dispute regarding whether the USDA properly processed the personnel actions agreed to in the second settlement agreement in terms of crediting Kraft with the promotion arguably promised through the date of

---

[18] There is some evidence that the period from February 3, 2000, through May 19, 2000, was included in the computation of Kraft's retirement annuity. If so, what distinguishes the period that Kraft was on annual or sick leave from the time period she was on leave without pay in terms of the calculation of the retirement annuity? She was still being carried on the books as being employed (*i.e.*, leave without pay was being annotated according to the USDA) and the promotion increase in terms of salary was promised through November 3, 2000. Or, to put the question somewhat differently, is the retirement annuity calculation based on what was actually paid in gross wages or based on Kraft's level of salary? For example, what would have happened had Kraft been on leave without pay for thirty days in 1999? Would that time have been counted in terms of the calculation of the retirement annuity at the salary level then in effect?

November 3, 2000, and whether the USDA submitted correct information to OPM for calculation of Kraft's retirement annuity. This is another reason why the government's motion for summary judgment must be denied with respect to Kraft's claims of breach of the second settlement agreement.

### 3. Alleged failure to process the agreed upon personnel actions within the time period required by the agreement

The second settlement agreement provides in relevant part: "The Agency will process the necessary personnel actions within 30 days from the date of this agreement." The settlement agreement was executed as of September 4, 2001.

It appears from the record that the processing of certain of the personnel actions by the USDA took place outside of the agreed upon 30-day period. For example, it appears that part of the back pay that the USDA agreed to pay was not processed until January 2002. Also, it appears there was a substantial delay in adjusting Kraft's retirement annuity to reflect the increases in pay and promotion promised by the USDA. Kraft claims that this delay prejudiced her financially.

The court concludes that there are material issues of disputed fact regarding whether the USDA fully complied with its promise to process the necessary personnel actions within the time period agreed upon, whether this included notification of OPM (and, if so, in what time period), and whether any of these delays caused Kraft financial loss. See Owens v. West, 182 F.Supp.2d at 195-197 (court denied summary judgment when confronted with similar issues). This is yet another reason for denying the USDA's motion for summary judgment as to Kraft's claims of breach of the second settlement agreement.

### 4.   Failure to pay interest on the agreed upon back pay amounts

Kraft also claims that the USDA failed to pay interest on the back pay amounts that were paid.  The settlement agreement, however, does not explicitly require the payment of interest and the issue does not appear to have been discussed contemporaneously with execution of the settlement agreement.  In fact, during the hearing before the court, Kraft acknowledged she became aware of what she considers to be the obligation to pay interest on back pay amounts after the settlement agreement was entered into.

The court doubts the validity of this claim.  The only legal authority cited by Kraft is a reference to 5 C.F.R. § 550.805, which appears  to have been adopted pursuant to the Back Pay Act codified in relevant part at 5 U.S.C. § 5596(b).  Section 5596(b), however, only covers back pay that is mandated by "appropriate authority under applicable law, rule, regulation, or collective bargaining agreement . . . ."  Id.

In this case, the back pay amounts agreed to by the USDA were voluntary and without any finding by the EEOC, or other authority, that the same must be paid.  Thus, it does not appear that either the Back Pay Act or 5 C.F.R. § 550.805 applies in this case.  Bowden v. United States of America, 106 F.3d 433, 440-441 (D.C. Cir.1997) (interest not due under the Back Pay Act when amount paid was not mandated by "appropriate authority" within the meaning of the Act).

 Nevertheless, given the court's conclusion that there are material facts in dispute regarding Kraft's claims of breach of the second settlement agreement and that the USDA's motion for summary judgment must be denied to that extent, the court will not finally decide this issue now, but something more will have to be presented to convince the court that interest is owed on the payments that were made within the agreed upon 30-day period.

It must also be observed that this is a different issue from whether or not Kraft is entitled to interest with respect to late performance.  If Kraft can prove that she received certain promised considerations late, or that she still has not received them at all, she has an argument that  interest should be paid on the value of those considerations from the time when performance was due under the second settlement agreement until the time the promised considerations were, or are, received by her.

### 5.    USDA's defense of failure to exhaust administrative remedies

The USDA claims that Kraft is not entitled to any relief because she failed to exhaust her administrative remedies.  With respect to the second settlement agreement, the government claims that she failed to comply with the requirements imposed by 29 C.F.R. § 1614.504 by failing to notify the USDA of the alleged breach within 30 days of the noncompliance.  The USDA argues that its last check in payment of back pay was issued to Kraft on or about January 7, 2002, so that any complaint should have been made on or before February 7, 2002.  The USDA further asserts that no complaint was made until Kraft's attorney faxed a letter to the USDA on March 4, 2002; hence, Kraft should not be allowed to pursue her claims for breach of the second settlement agreement.

However, what the USDA neglects to mention is that Kraft's attorney made at least one prior complaint to the USDA in November 2001 about the fact the USDA was late in performing prior to the second check being processed and received assurances that further performance was forthcoming.  Consequently, by the time that the USDA sent out its second back pay check in January 2002, (and there is no evidence as to when it was actually received), the USDA had already created the impression that its performance was coming late and in dribbles.  Consequently, at that point, Kraft would have a reasonable amount of time in which to conclude that the USDA had

actually stopped performing before any 30-day period would begin to run.  And, given the fact that the USDA's performance was by that time a number of months late, the court concludes, based on the undisputed facts, that it was reasonable for Kraft and her attorney to have waited at least until March 4, 2002, to further complain about the fact that, in their view, the USDA had still not fully performed under the settlement.[19]  Cf. Owens v. West, 182 F.Supp.2d at 190-191.

Also, the defense of failure to timely assert administrative remedies fails for another more fundamental reason.  The USDA's final agency decision with respect to Kraft's claims of breach of the second settlement agreement makes no mention of her claims being denied for failing to timely assert her administrative remedies and, in fact, addresses the merits of the claims.  Likewise, there is no evidence that the USDA relied upon this defense in the proceedings before the EEOC and the EEOC's decision, which also was rendered on the merits, does not mention the defense.  See Defendant's Statement of Material Facts, Exs. 23 &25.  Based on this, the court concludes that the USDA waived this defense or is otherwise estopped from asserting it.  E.g.,  Bowden v. United States, 106 F.3d 433, 438-439 (D.C. Cir. 1997); Owens v. West, 182 F.Supp.2d at 190-191.

Finally, the defense of failure to timely exhaust administrative remedies is not jurisdictional. Id. at 437. Based on the undisputed facts, the court concludes that Kraft substantially complied with the administrative requirements in processing her claims of breach, particularly given the confusion created by the fact this matter involved a second settlement agreement entered into, in part, to address claims of alleged  breaches of a first settlement agreement and the USDA's undisputed late

---

[19]  In fact, there is also a substantial question whether the USDA had completed its performance by  March 4, 2002, apart from the non-payment of the additional back pay that Kraft claims she is due. There are material disputed facts as to when the USDA forwarded all of the necessary information to OPM so that Kraft's retirement annuity would fully reflect the promised promotion and payment of back pay.  Also, there are material disputed facts regarding when the OPM processed the necessary changes to fully implement the settlement, whether any corrective payments issued by OPM fully reimbursed Kraft for what she was due, and the USDA's responsibility for any delays that may be fully attributable to OPM, i.e., not resulting from delays by the USDA in forwarding the necessary information to OPM.

performance.   Further, the administrative process was completed by Kraft and the USDA can point to no prejudice resulting from the claimed failure to timely notify it of the additional alleged breaches.   Consequently, the failure-to-timely-exhaust defense fails for these reasons as well.

### E.     Kraft's claim for breach of the first settlement agreement

As set forth above, the court has concluded that Kraft is not entitled to rescind the second settlement agreement and that her claims of violation of her civil rights, both before and after the first settlement agreement, were released under the second settlement agreement.   The court has also concluded that rescission of the first settlement agreement is not appropriate given the court's disposition of the second settlement agreement. The court now turns to Kraft's claims of breach of the first settlement agreement that were not released by the second settlement agreement.

The USDA argues that any remaining claims that Kraft may have had  for breach of the first settlement agreement  are now moot given her disability retirement and her release of her underlying civil rights claims in the second settlement agreement.   While, as a practical matter, this may be true, the court disagrees this is the legal result of Kraft not having fully released her claims of breach of first settlement agreement.

The USDA argues, and the court agrees based on the authority previously cited, that a claim of breach of a settlement agreement must be resolved following general contract principles.   Under general contract principles, a party to a contract is entitled to prosecute a claim for breach and recover, at the very least, nominal damages. E.g., Everyday Learning Corp. v. Larson, 242 F.3d 815, 819 n.4 (8th Cir. 2001) (construing Minnesota law); Hummel v. Mid Dakota Clinic, P.C., 526 N.W.2d 704, 709 (N.D. 1995) (citing other authorities); see generally 24 Williston on Contracts § 64:6 (4th ed.).

43

The government also asserts the defense of failure to properly exhaust administrative remedies with respect to Kraft's claims of breach of the first settlement agreement. Specifically, it refers to a decision by an EEOC administrative law judge that Kraft failed to notify the EEOC Director of Complaints Compliance of the alleged non-compliance as required by paragraph 5 of the first settlement agreement and 29 C.F.R. § 1614.504. Picking up on this theme, the USDA argues in its brief to this court that (1) Kraft's attorney acknowledged in her own writings that the USDA was in breach as of February 3, 2000, and (2) that Kraft did not contact the Compliance Office and, instead, notified the USDA's State Executive Director of the breach on April 14, 2000, more than 30-days after Kraft's attorney alleged acknowledged the USDA was in breach of the agreement. Hence, the USDA argues that Kraft failed to properly exhaust her administrative remedies under § 1614.504, claiming the notice was untimely and was sent to the wrong person.

How the issue of the claimed failure to properly exhaust administrative remedies became an issue for the EEOC administrative law judge is somewhat of a mystery. The USDA's final administrative action denying Kraft's claims of breach of the first settlement agreement makes no mention of an alleged failure to exhaust her remedies in accordance with the agreement. See Defendant's Statement of Material Facts, Ex. 23. This is probably because, unless the communications and the express mail receipt attached to Plaintiff's Statement of Material Facts as exhibits 27 & 28 have been fabricated, Kraft and her attorney did fax to the Director of Complaints Compliance a detailed complaint of alleged non-compliance on March 3, 2000, and forwarded the original by express mail the next day. Finally, and again not surprisingly, when the EEOC made its final decision with regard to this matter, it also made no mention of any alleged failure by Kraft to have exhausted her administrative remedies. See Defendant' Statement of Material Facts, Ex. 25.

44

Based on the authority previously cited, the court concludes that the USDA waived its defense of failing to properly exhaust administrative remedies or is estopped from asserting it. Further, it appears from the documents that have been submitted to the court that Kraft did timely notify the Compliance Office and fulfilled her contractual and regulatory requirements with regard to notice of the claimed breaches.[20]

Turning then to the merits of Kraft's claims of breach of the first settlement agreement, there is no dispute that it provided sensitivity training to its Morton County staff and gave Kraft information regarding promotion procedures in the time frame contemplated by the agreement. See Plaintiff's Statement of Material Facts, Exs. 2, 27, and 32. Likewise, there is no dispute that it paid Kraft's attorney's fees. See id.

The primary item of disputed performance relates to that part of the first settlement agreement requiring that the the USDA provide "2 plexiglass, acoustical partitions" and a third if Kraft later deemed it necessary. As indicated earlier herein, Kraft complained that the partitions ordered by the USDA were not acoustical and that they reflected sound and made the situation worse. Some time later, the USDA installed two cloth dividers that it had on hand to supplement the plexiglass panels. Kraft acknowledged this improved the situation somewhat in terms of visual distractions, but did not provide meaningful protection from distracting sounds.

---

[20] Also, the government's required performance under the first settlement agreement was to come in stages and the agreement explicitly provided that, after the agency fully implemented the agreement, it was to provide the Compliance Office with written notice explaining what was done to implement the agreement. As of the date Kraft and her attorney notified the Compliance Office of the USDA's failures to comply - at least up to that point, the USDA had not yet conducted the sensitivity training it was required to provide Kraft's co-employees, which it had until April 5, 2000, to perform, nor had it notified the Compliance Office that it had fully implemented the agreement. A very reasonable construction of the first settlement agreement is that Kraft was not obligated to notify the Compliance Office of every minor breach in terms of alleged late performance and was only obligated to provide the 30-day notice when, after the USDA's time for total performance expired, it was reasonably clear that no further performance was forthcoming.

The USDA argues that it literally complied with the contract requirements, pointing to a fax it obtained from the suppler of the partitions, Advanced Office Concepts (which appears to be an office-products supplier and not the manufacturer) after Kraft raised questions about whether the partitions were acoustical, which stated the following:

> I want to confirm our conversation regarding the acoustical rating on our glass partition. It has a NRC (Noise Reduction Coefficient) of .25. This compares to our acoustical panel with a .70. The difference has to do with construction of a glass panel versus a honeycomb fiberglass panel.
>
> Both panels do have an acoustical rating; the difference has to do with the construction. Please do not hesitate to contact me with any further questions.

 See Defendant's Statement of Material Facts, Ex. 13. The USDA argues that what it supplied does have an acoustical rating and that, since the contract did not require any particular rating, the government complied with the contract requirements.

However, there are a number of problems with the USDA's argument. First, simply the fact the partitions have an NRC rating does not mean the partitions would be considered "acoustical" in the sense of providing any reasonable modicum of sound absorption. Based on the USDA's argument, a panel with rating of 0.05 would comply, which is an absurdity. In fact, one inference that can be drawn from the USDA's fax is that Advanced Office Concepts did not consider the panels to be "acoustical" in any reasonable sense, or within the meaning normally ascribed to this term in the trade, given the language: "This compares to our acoustical panel with a rating of .70." (emphasis added)

Second, there are problems with relying upon the 1999 fax from Advanced Office Concepts as gospel that the plexiglass partitions it supplied actually had a rating of 0.25. It appears this piece of information is based upon multiple levels of hearsay, and there is no way for the court to assess

its reliability.  For all the court knows at this point, the author of the fax may have been a salesmen who incorrectly interpreted specifications provided by the supplier.

The court makes this point, not for the purpose of engaging in an academic discussion regarding the evidentiary value of the fax, but because there is substantial reason to doubt the validity of the 0.25 number.  The record indicates that the partitions were completely glass with no fabric or other sound absorption material.  The information supplied by Kraft, including the opinion of an acoustical expert, indicates that glass partitions normally would have an NRC rating in the neighborhood of 0.05 ( *i.e.*, essentially zero) and would reflect sound, not absorb it.

In response to the USDA's claim that the plexiglass partitions were "acoustical, Kraft offers her testimony that the partitions did not provide any acoustical protection and made the situation worse in terms of reflecting noise.  In addition, Kraft offers several other items of evidence including the following:

1.     Kraft has her own unsworn communications from Advanced Office Concepts that she acquired in 2001. One of these states in relevant part the following:

> Thank you for returning my call.  I think you'll find the information below helpful. The Noise Reduction Coefficient (NRC) is a single-number rating that establishes the degree of sound absorption of a product or system. Sound-absorption coefficients, measured at standard frequencies between 500 and 4000 Hz, are averaged and presented on a scale of 0 to 1.00.  An NRC of 0.1 is a poor absorber while 0.9 is an excellent absorber.

> An effective panel is usually a 1" thick, fiberglass panel covered with an open-weave fabric.  Our Status Seeker Acoustical Panel is actually 2¼" thick, fiberglass/honeycomb interior with a .85 NRC rating.  In essence, this means that 85% of the sound levels are absorbed.  Our standard core is not rated because it is a straight honeycomb interior without fiberglass.

The 1.5" thick, Class A Fire-rated Divider Plus Panel has an NRC rating of .70.  Keep in mind that when you make a Divider Plus Panel half plexiglass you will lose most of the NRC rating because the glass is not a sound absorbing material.

A regular plexiglass panel reflects noise and will never have an interior other than glass and therefore cannot be rated.  You would have to use a Demountable Glass wall to obtain the visibility and keep some of the noise out.  The function of the space would determine if a floor-to-ceiling wall would provide an adequate solution.  Normally the use of a plexiglass panel is for sight purposes only and is not used if looking for sound absorption.

See Plaintiff's Statement of Material Facts, Ex. 11.

2.    A page from the catalog of an office-products supplier (possibly "NBF") containing excerpts from a product brochure, which was supplied to Kraft's counsel by an attorney from the USDA and represented as having come from the file of the person who executed the first settlement agreement on behalf the USDA.  The excerpt describes three types of available screens: standard, heavy-duty, and acoustical.  It describes the "standard panel" as having a .25 NRC rating and being a screen of "fabric over hard core." The other screens, based on the excerpted material, are obviously not plexiglass.  It does mention that screens are available in plexiglass, but it is not at all clear whether any particular NRC rating would be attached to such screens.

See Plaintiff's Statement of Material Facts, Exs. 17 & 19.

3.    The signed opinion of an acoustical expert, along with the expert's CV, who offers the following opinions:

a.    The plexiglass panels installed by the USDA provided no acoustical protection and would rate approximately 0.04, or essentially zero.  In fact, the panels are

48

reflective and only serve to scatter sound within the work space (exactly what Kraft complained about).  Further, the only way for these panels to provide any sound absorption would be to cover them with a very heavy fabric material and, even then, the likely yield would be an NRC rating of only 0.15 or 0.20.

b.   To be effective, the panels should have an NRC rating of 0.80 or higher and should be constructed of a fiberglass core covered with an appropriate fabric and have an interior plenum to provide the needed sound barrier.

c.   Well-designed acoustical barriers are likely not to be effective, at least to meet minimum design criteria, unless there is also a well-designed acoustical ceiling, which Kraft's office did not have.  He also recommended a number of changes with regard to the layout of the office.

See Plaintiff's Statement of Material Facts, Ex. 12.

In terms of the circumstances leading up to the agreement, the undisputed evidence indicates that the USDA was willing to agree to the installation of partitions so long as the partitions maintained sight lines within the office because of its open-office arrangement.   On the other hand, Kraft wanted partitions that were acoustical and did not care whether the partitions were plexiglass or made out of solid material.  The compromise was the installation "acoustical, plexiglass panels."

Based on the foregoing, and giving effect to both the words "acoustical" and "plexiglass," the court concludes that the contract language required  that the promised panels would be capable of providing some reasonable amount of sound absorption and that there are material issues of disputed fact as to what that reasonable level would be.  In fact, construing the evidence most favorably to Kraft, there are substantial questions regarding whether the plexiglass partitions

49

provided any meaningful acoustical protection, much less whether the partitions were considered "acoustical" in the trade or would be considered "acoustical" to an average person informed as to the significance of the NRC values.  Consequently, the USDA is not entitled to summary judgment based on the argument that it literally complied with the contract requirements. [21]

However, this does not end the court's consideration of the partition issue.  This is because, giving Kraft the benefit of her evidence (which at this point appears to be the more credible), the inevitable conclusion is that plexiglass panels can never provide a reasonable modicum of acoustical protection - a fact not known to the parties at the time that they entered into the agreement.

In other words, the most that Kraft can prove if the case proceeds to trial and her evidence is accepted is that the parties mistakenly agreed to something that could not possibly be performed.  Applying general contract principles, the legal result of this is that the promise to provide the "acoustical, plexiglass partitions" unenforceable, as well as the entire contract given that the installation of the partitions providing some acoustical control was an essential contract term.  See generally  17A Am.Jur.2d Contracts § 216; Farnsworth on Contracts §§ 9.5 - 9.9 (3rd ed. 2004).

Normally, when a contract becomes unenforceable, the parties would be restored to the positions that they were in prior to entering into the contract.  See id.  But, in this case, this is not possible because Kraft released her underlying civil rights claims in the second settlement agreement.

---

[21]  After the FSA determined that the plexiglass partition it had ordered were not enough, the FSA erected two supplemental fabric partitions while it considered other possibilities.  See Defendant's Statement of Material Facts, Ex. 13 [Affidavit of Scott Stofferahn, ¶¶ 4-8].  However, Kraft complained this also was not sufficient, and, in effect, rejected this offer of compromise performance that varied from the terms of the contract.   Further, even considering these additional cloth dividers, there are material issues of fact in dispute as to how much additional acoustical protection was actually provided given the composition of the material and their placement.

At first blush, not restoring Kraft to her previously held rights may seem to be a harsh result. However, all of the underlying facts that the court now relies upon to reach this conclusion were known to Kraft and her counsel at the time of the execution of the second settlement agreement.  In fact, Kraft was in the process of attempting to rescind the first settlement agreement based on these facts when she elected to settle in the context of taking a disability retirement and receiving a number of other considerations, including a retroactive promotion with back pay, a lump-sum payment, and attorney fees.  While she did leave open the right to pursue the claim for breach of the first settlement agreement, it was without any assurance she had a viable claim.

Also, the first settlement agreement must be considered in its proper context.  Essentially, the first settlement agreement provided that certain things would be tried in an attempt to address Kraft's claims of disability in exchange for Kraft releasing any claims she had up to that point. However, no promise was made by either party with respect to the future.  Consequently, if the agreed upon accommodations proved to be ineffective (and there is substantial evidence that this was the case),  Kraft was free to bring new claims for violation of her rights and, as appropriate, force the USDA to make further accommodations or obtain other relief, at least on a going-forward basis.  This also Kraft elected not to do by execution of the second settlement agreement.[22]

Based on the foregoing, the court concludes that Kraft has no viable claim for breach of the first settlement agreement based on the FSA's alleged failure to install plexiglass partitions that were acoustical.  However, since the FSA never contemporaneously sought to avoid the agreement on the

---

[22]  Kraft may now believe  she made a poor choice in agreeing to the second settlement agreement, but this is not grounds for undoing the second settlement agreement.  Further, Kraft needs to keep in mind that she faced other substantial hurdles in the prosecution of her case, including the question of whether her medical conditions could ever have been reasonably accommodated.  In that regard, the court notes that Kraft attempted to take a disability retirement before all of this started and that she even tried using earplugs, which also apparently was not successful. Given the evidence before the court, the decision by Kraft to enter into the second settlement agreement appears to have been a very reasonable one.

grounds of impossibility, the court believes it necessary to consider the remainder of Kraft's claims of breach of the first settlement agreement.

Kraft also contends that the FSA did not respect her privacy and distributed her confidential medical records to staff, contrary to the requirements of the first settlement agreement.  As circumstantial evidence of this misconduct, she cites office gossip, as well as the snide comments and boorish behavior of her former co-workers.  In response, the USDA acknowledges that it did disclose details of Kraft's medical history, but only to those who needed to know at the managerial level.  It denies having leaked or otherwise disseminated medical records to the extent alleged by Kraft.  In addition, it suggests any awareness that unauthorized persons may have had regarding Kraft's medical condition came from what these persons observed in the workplace regarding the accommodations being provided as opposed to alleged access to Kraft's medical records or information received based upon some other unauthorized disclosure.

The FSA was arguably required to release some information about Kraft's condition to key personnel in order to perform of its obligations under the parties' agreement.  Further, given Kraft's oral and written statements to the court, it is not the disclosure to those in the upper echelon to which she takes exception; her focus is on those employees she worked alongside. Thus, the FSA's limited admission to releasing information is not by itself sufficient to constitute a breach contract.

Further, upon  reviewing the record, it appears that Kraft's issues with her co-workers were ongoing and to a certain extent predated the execution of the parties' settlement agreement.  While Kraft surmises that her co-workers were armed with intimate knowledge of her medical history, it is more probable that their comments to Kraft were based on nothing more than their own observations of the partitions being installed and considerations being given to Kraft that were not

being afforded to them.  In any event, all Kraft has offered the court is supposition; she has not presented the court with any concrete facts of breach to place a material fact in issue.

Kraft also argues that the FSA agreed to put the door back on the room containing the printers.  The FSA argues that there was no binding contractual commitment because this was not included in the first settlement agreement.

In this case, not only is the matter of the doors not mentioned in the first settlement agreement, the agreement also contains specific language stating that the written agreement was intended to be the final, integrated agreement.  In the opening sentence, the agreement states that it is a "full, complete, and final settlement of all the employment concerns" raised before the mediator.  Later, the agreement also provides that both parties have agreed to a number of points including:

> 3.      To declare this complaint resolved through this resolution.  There are no other agreements between the parties, either express or implied, oral or written.

There is a division of opinion as to whether a court may consider extrinsic evidence to add terms to a written agreement when, as in this case, the agreement contains an integration clause. Some courts take the position that the presence of an integration clause creates a presumption that the agreement is integrated, but is only one factor, albeit an important one, to be considered in determining whether the parties actually intended the written agreement to be fully integrated.  E.g., Bowden v. U.S., 106 F.3d at 439-440 (D.C. Cir. 1997); see generally 11 Williston on Contracts § 33:21 (4th ed.); Farnsworth on Contracts § 7.3 n.37 (3rd ed. 2004) (citing cases).  The more traditional view, however, is that integration clauses are conclusive in the absence of grounds for setting aside the clause, e.g., fraud, mistake, duress, or the clause being be unconscionable.  E.g., Rumsfeld v.

Freedom NY, Inc., 329 F.3d 1320, 1328-29 (Fed.Cir. 2003) (containing an extended discussion of the positions taken by the treatise writers and the Second Restatement); see  Blackledge v. Allison, 431 U.S. 63, 75 n.6 (1977) (*dicta*); see generally 11 Williston on Contracts § 33:21 (4th ed.); Farnsworth on Contracts § 7.3 & n.36 (3rd ed. 2004) (considering this to be the more preferable approach); 6 Corbin on Contracts § 578 &  Cum. Supp at n.(B)(1) (stating that such clauses should be given effect unless the court sets the clause aside on one of the grounds for avoiding contracts). After careful consideration, the court concludes the latter position is the one that would more likely be adopted as governing federal common law by the Eighth Circuit and the United States Supreme Court because of the value of the certainty it provides.

In this case, Kraft was represented by counsel, the agreement was relatively short, and was not a form agreement.  Hence, there is no basis for setting aside the integration clause on the grounds that it was unconscionable.  Further, Kraft has not proffered sufficient evidence to set aside the clause on other grounds.  Consequently, the court concludes that it may not consider the extrinsic evidence offered by Kraft that the parties intended that the replacement of the door to be an additional term of the agreement.[23]  However, even if the court is wrong and that Kraft would be able to prove there was this additional agreed-upon term, Kraft likely would be limited to collecting nominal damages of $1.00, if she is able to collect anything at all, given the court's disposition of the other issues.

---

[23]   The extrinsic evidence that Kraft has proffered as to the claimed oral agreement to replace the door is substantial.  In fact, the county executive director for the FSA who was present at the mediation stated artfully in her affidavit "[t]here was no agreement that a door would be installed *immediately* on that room . . .[emphasis added]."  See Defendant's Statement of Material Facts, Ex. 14.  Further, in various filings, the USDA states the door was eventually put on, which appears to be true, but it also appears it took almost five months and that it was not put on until after Kraft had taken indefinite leave in early February 2000.  In this case, the court need not address whether any promise regarding the door constituted a separate, enforceable agreement.  See Farnssworth on Contracts § 7.3 (3rd ed. 2004) The only item left open under the second settlement agreement is whether there was a breach of the first settlement agreement.

In summary, the court concludes based upon the undisputed <u>material</u> facts that Kraft does not have a viable claim for breach of the first settlement agreement. Hence, the USDA is entitled to summary judgment as this claim.

## III.   CONCLUSION AND ORDER

Defendant's Motion for Summary Judgment (Docket No. 31) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.   Plaintiff's claims for rescission of the 1999 and 2001 settlement agreements are dismissed.

2.   Plaintiff's claims for breach of the first settlement agreement are dismissed.

3.   Plaintiff's underlying claims for violation of her civil rights are dismissed.

4.   Defendant's motion for summary judgment as to plaintiff's claims for breach of the second settlement agreement is denied. Plaintiff will be allowed to proceed with respect to her claims of breach of the second settlement agreement.

**IT IS SO ORDERED.**

Dated this 3rd day of May, 2006.

<u>/s/ Charles S. Miller, Jr.</u>
Charles S. Miller, Jr.
United States Magistrate Judge