**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA
SOUTHWESTERN DIVISION**

| | | |
|---|---|---|
| Renee T. Kraft, | ) | |
| | ) | |
| Plaintiff, | ) | **FINDINGS OF FACT,** |
| | ) | **CONCLUSIONS OF LAW, AND** |
| vs. | ) | **ORDER FOR JUDGMENT** |
| | ) | |
| Mike Johanns, Secretary of the | ) | Case No. 1:04-cv-084 |
| United States Department of Agriculture, | ) | |
| | ) | |
| Defendant. | ) | |

Renee Kraft initiated this action on June 25, 2004, by filing a *pro se* complaint against the Secretary of the United States Department of Agriculture ("USDA"), Mike Johanns.  Kraft had previously been employed by the Farm Services Agency, a part of the USDA, and the defendant Secretary will be referred to as the "FSA."

On May 3, 2006, the court permitted Kraft to amend her complaint, which consists of several lengthy narratives, the gist of which are that:  (1) the FSA discriminated against her on account of her disabilities and age, including a failure to provide reasonable workplace accommodations; (2) the FSA failed to comply with the parties' first settlement agreement by not providing her with promised workplace accommodations and by failing to respect her privacy rights; (3) the FSA continued to discriminate against her on the basis of her disability and age after the first settlement agreement was consummated; (4) the FSA retaliated against her for the exercise of her rights; (5) the FSA breached the parties' second settlement agreement by failing to pay promised considerations on time, by failing to pay interest on the promised back pay, and by incorrectly calculating her back pay, which, in turn, led to a miscalculation of her disability retirement benefits;

1

and (6) the FSA fraudulently induced her into signing both the first and second settlement agreements.

On May 3, 2006, the court granted in part and denied in part the FSA's motion for summary judgment. The court dismissed Kraft's claims for (1) rescission of the 1999 and 2001 settlement agreements, (2) breach of the first settlement agreement, and (3) the alleged violations of her civil rights. The court did not, however, dismiss Kraft's claims for breach of her second settlement agreement. While most of the facts were undisputed, the court concluded there were several points of disagreement that might have a bearing upon the interpretation of the agreement and whether the FSA had fully complied it. Consequently, the court conducted a limited bench trial to resolve the factual disputes as to these two matters. And, at that point, Kraft was able to find counsel to assist with her evidentiary presentation.

The following are the court's findings of fact, conclusions of law, and order for final judgment.

## **FINDINGS OF FACT**

1.     Kraft worked for the FSA, which is a part of the USDA, as a program assistant/program technician for more than seventeen years before retiring on disability. While still employed by the FSA, Kraft claimed that she suffered from several mental and learning disabilities - primarily attention deficit disorder, that she was discriminated against on account of her disabilities, and that the FSA failed to provide necessary accommodations. Kraft pursued her complaints administratively before the FSA and then with the EEOC. Eventually, the parties resolved the first EEOC complaint by a settlement agreement executed on October 5, 1999, (the

"first settlement agreement"), wherein the FSA agreed, among other things, to make several workplace accommodations in exchange for a release of Kraft's discrimination claims.

2.       Not long after the execution of the first settlement agreement, Kraft complained that the FSA had failed to implement all of the agreed upon accommodations.  The details of the alleged noncompliance are set forth in the court's earlier order on summary judgment.  Later, on February 3, 2000, after meeting with her supervisor to discuss her job performance, Kraft left work early, complaining of a headache.  She called in sick the following day.  On Monday, February 7, 2000, Kraft's psychologist contacted Kraft's supervisor to advise that Kraft was taking an indefinite leave of absence for mental health reasons.

3.       While on leave, Kraft first exhausted her sick time and vacation time, which ran out on March 20, 2000.   While on sick and annual leave, Kraft continued to receive her full pay and benefits.  Beginning March 20, 2000, she was paid for 3.2 hours for the last of her sick and annual leave and then started on leave-without-pay status ("LWOP").

4.       Kraft never did return to work.  She submitted an application for disability retirement in May or June of 2000, which was approved by the Office of Personnel Management ("OPM") in November 2000.  While her application for disability retirement was pending, she continued on LWOP through November 3, 2000, which was the effective date of her disability retirement. Altogether Kraft was on LWOP for approximately eight months from March 20, 2000, through November 3, 2000.

5.       Kraft continued with the prosecution of her claims that the FSA had breached the first settlement agreement by failing to provide the promised workplace accommodations, that the FSA had continued to discriminate against her despite the first settlement agreement, and that the FSA

3

had retaliated against her on account of her exercise of her rights.  In addition, she also alleged that the FSA's failure to provide the necessary accommodations left her with no other choice but to take disability retirement.

In the summer of  2001, and while Kraft's complaints were still pending before the EEOC, the parties began talking about another settlement agreement.  The discussions were facilitated, in part, by the EEOC requiring the parties to submit their respective positions on settlement.  In response to this  directive, the FSA submitted a settlement offer that included a retroactive promotion for Kraft effective March 30, 1997, along with the payment of back pay through the November 3, 2000, which was the date of her disability retirement.

On July 31, 2001, Jean Freeman, an employment specialist from the USDA/FSA's Washington headquarters, faxed to Kraft's attorney[1] tentative calculations showing the financial impact of the proposed promotion on the amounts previously paid Kraft.  Also, there was attached an estimate of the promotion's impact on Kraft's disability retirement annuity, which was based on her "high-3 average salary."  (Ex. P-2)  Two things are notable about this estimate for reasons discussed later. First, the salary amounts used for the"high-3 average salary" calculation were too low because of the use of an outdated pay table.  Second, the estimate was based on Kraft's increased salary being effective through November 3, 2000, the date of her disability retirement from the FSA.

---

[1]  Kraft was represented by an attorney during the prosecution of her complaints before the USDA/FSA and the EEOC.  By the time that Kraft filed this action, the attorney who had represented her before the agency and the EEOC had left the area and Kraft proceeded *pro se*.

4

6.      On September 4, 2001, just days before a scheduled hearing before an EEOC administrative law judge, Kraft and the FSA executed a second settlement agreement (Ex. P-8), in which the FSA agreed to:

a.      Promote [Kraft] to a CO-7/5 effective March 30, 1997, with back pay through November 3, 2000, date of [Kraft's] disability retirement. [Kraft] will be granted a Within-Grade-Increase to a CO-7/6 effective April 11, 1999.  All applicable deductions will be deducted from the back pay as prescribed by procedure.  FSA will process the necessary personnel actions within 30 days from the date of this agreement.  All leave taken between February 3, 2000, and November 3, 2000, will remain as annotated on Kraft's T&A's.

b.      Process the necessary paperwork to pay a lump sum amount of $15,000 (fifteen thousand) to [Kraft] within 30 days from the date of the signing of this Agreement.  The payment will not be subjected to withholdings by the Agency, however, an IRS form 1099 will be issued to [Kraft].

c.      Process necessary paperwork to pay reasonable and customary attorney's fees pursuant to 29 C.F.R. § 1614.501(e) within 30 days from the date of receipt of an itemized bill from [Kraft's] counsel.

In return, Kraft agreed to:

a.      Hereby withdraw her EEO Complaint No. Cr-000504 and EEOC Case No. 320-AO-8383X, and any other pending appeals, complaints, grievances, civil actions, or any other claims regarding her employment with the FSA, except the allegation of a breach of the Settlement Agreement dated October 5, 1999.

b.      File no new appeals, complaints, grievances, civil actions, or any other claims regarding the claims at issue in this complaint, except for the "breach" issue listed in "a" above.

c.      Release the USDA, the [FSA], their employees and officers in their official capacities from any and all claims relating to the events which gave rise to the complaint that is the subject of this agreement, except for the "breach" issue listed in "a" above.

7.      As discussed in more detail below, a dispute later arose over the meaning of the language of the agreement stating that all leave would remain as annotated on the "T&A's" (time

and attendance sheets) in the context of the agreement to pay back pay through November 3, 2000. Consequently, for reasons discussed in the court's conclusions, some facts regarding the development of the disputed language are relevant.

Approximately one month prior to execution of the second settlement agreement, Freeman met with Kraft and her attorney in Bismarck to discuss the possibility of settlement. It is unclear whether this meeting was before or after the fax of information from Freeman to Kraft's attorney on July 31, 2001. At this meeting, Freeman outlined what the FSA was prepared to offer, focusing primarily upon the retroactive promotion and the payment of back pay. After the meeting, Freeman returned to Washington and drafted the language of the second settlement agreement, which was then sent to Kraft's attorney. On the day of the signing of the agreement, the draft was the subject of a phone conference involving Freeman, Kraft, and Kraft's attorney prior to execution of the agreement.

8.      Freeman could not recall precisely what was discussed during the Bismarck meeting or the subsequent telephone conference, but recalled generally that she addressed the retroactive promotion; the payment of back pay through the November 3, 2000, which was the disability retirement date; and the fact that the Kraft's leave would remain as annotated on the time and attendance sheets ("T&A's"). She also testified that her construction of the "leave" language drafted by her was that Kraft would not be paid back pay during the time that she was on LWOP. Freeman presented no credible testimony, however, that the LWOP was specifically discussed during either the Bismarck meeting or the later telephone conference.

Kraft did not specifically address the Bismarck meeting during her testimony. She testified generally to her understanding of what had been offered by the FSA and somewhat more specifically

about the phone conference on the day of the execution of the agreement from which she made contemporaneous notes.  Kraft testified it was her understanding, based on both the fax of July 31 and the later phone conference, that she would be paid back pay through November 3, 2000, which she interpreted to mean would include pay for the time she was on LWOP.  She testified her understanding of the purpose for the language "leave would remain as annotated" was simply to make clear that the promise to pay back pay through November 3, 2000, did not include restoration of the vacation and sick leave time she had taken, but not to deny her back pay for the almost eight months that she was on LWOP prior to November 3, 2000.  Under FSA's policies, Kraft would have been entitled to additional compensation for any restored annual or sick leave that was unused at the date of her separation from service.  In other words, Kraft's understanding was that she would get the back pay through November 3, 2000, but not back pay <u>plus</u> restoration of her annual and sick leave, which would have entitled her to yet another check.

Kraft's contemporaneous notes of the telephone conference with Freeman contain the following notation:  "Pay will be made at new level Can't get $ for what already received (Leave)."  While the notation does not make explicit reference to the LWOP, Kraft testified she wrote this note consistent with her understanding of the overall discussion regarding the payment of back pay through November 3, 2000, including the time she was on LWOP.  The particular words used are consistent with that understanding if the focus is upon compensation, which it was for Kraft at the time,  *i.e.*, the use of the words "what already received" is consistent with her having been paid for her vacation and sick leave but not for the LWOP.  Kraft's contemporaneous notes made more credible her testimony as to her understanding of the deal prior to signing the agreement.

9.     Following the execution of the settlement agreement, Jennifer Broin of the North Dakota state office of the FSA finalized the calculation of the amount of back pay due pursuant to the agreement, but only for the period from March 30, 1997, through October 9, 1999.   On September 26, 2001, Broin forwarded a request for payment of back pay for the time period she had calculated in the net amount of $2,644.69 to the National Finance Center ("NFC"), which is a separate agency of the USDA.  (Ex. D-101)   A check in the amount of $2,644.69 was issued by the NFC on September 29, 2001.  (Ex. D-102)

Also, on September 28, 2001, the North Dakota office of the FSA forwarded to its Kansas City office the payroll changes that they had made for the period of March 30, 1997, through October 9, 1999, and asked the Kansas City office to certify the information and forward it to the OPM for recalculation of Kraft's disability retirement annuity.  (Ex. D-111)  As discussed later herein, no credible evidence was presented that the Kansas City office actually forwarded the payroll information to the OPM for the period from March 30, 1997, through October 9, 1999.[2]

10.     The North Dakota state office of the FSA was not able to calculate the required back pay for the period from October 10, 1999, through November 3, 2000, because the payroll-processing function had shifted from the state office to the NFC in October 1999.  Consequently, on September 28, 2001, Broin faxed to the NFC a request that it make the necessary payroll computations for the period from October 10, 1999, through November 3, 2000, and submit a

---

[2]  While not discussed by either party during the evidentiary hearing, there is buried in the massive amount of paper filed in connection with the motion for summary judgment a copy of a communication from the OPM to Kraft dated December 18, 2002, which, together with a single page attachment, suggests that the OPM may not have received the payroll changes for the period from March 30, 1997, through October 9, 1999.  This document was part of a larger group of documents previously supplied by Kraft to the USDA prior to commencement of this action and is not to be confused with an OPM notice dated a year earlier on December 19, 2001, of which the government submitted a portion as Ex. D-108.  See Docket No. 50, Kraft's Statement of Material Facts, Ex. 52.

supplemental retirement record card to the OPM.  (Ex. D-105)  The request included the notation: "Backpay - Pay ASAP!"

The NFC, however, was slow in responding to Broin's request.  On January 15, 2002, Broin e-mailed Neota Hall at USDA/FSA headquarters requesting her assistance in getting the NFC  to act.  Broin stated in the e-mail to Hall that she had already forwarded three requests to the NFC, but to no avail.  (Ex. P-23)

While this was happening, Kraft's attorney was corresponding with Freeman complaining about the fact that payment was late and that she and her client did not know what the payment already received was supposed to represent.   Freeman responded by forwarding a copy of the Broin January 15, 2002 e-mail to Hall in an attempt to explain the delay.  (Ex. 23)  Kraft's attorney followed up with a faxed letter to Freeman dated January 16, 2002, stating that she appreciated the difficulty in getting the NFC to act, but the payment was overdue and action would be taken if payment was not immediately forthcoming.  (Ex. P-22)

11.    Neota Hall from USDA headquarters responded on January 16, 2002, by e-mail to Broin's request for assistance by providing suggested language that Broin could use in requesting the NFC's assistance.  The language she suggested stated, in relevant part, the following:

> 3/20/00 through 11/3/00: Due to settlement agreement, LWOP for this time period is being cancelled.  Please issue check for 40 hours the week of 3/20/00 through 3/24/00 (second week of pay period), and 80 hours per pay period thereafter, at rate of C0-7 step six.  Please pay lump sum annual leave earned from 3/20/00 through 11/3/00

(Ex. 23)  Broin testified that the response went beyond what she asked Hall to do and that she had no idea where Hall obtained the information that the LWOP should be cancelled.  However, Hall's response contained more information about Kraft's situation than what was contained in Broin's e-

mail to her.   In particular, Broin's e-mail to Hall stated nothing about the LWOP.   Yet, Hall's response states that, due to the settlement agreement, the LWOP would be cancelled.   (Ex. 23) Consequently, it is a fair inference, particularly in light of the other evidence described below, that someone at USDA/FSA headquarters reviewed the circumstances of Kraft's situation in light of the settlement agreement and believed that the LWOP should be cancelled - whether it was Hall, Freeman, or some other person.

Freeman, who had been copied in on Broin's e-mail to Hall, testified that she did not believe she saw Hall's response.   Freeman did not have an explanation, however, for the reference at the top of the reproduced e-mail: "Jean Freeman-Re: Backpay - Renee Kraft." (Ex. 23)  Moreover, the day of Hall's response, January 16, 2002, was the same day that Kraft's attorney faxed her letter to Freeman acknowledging receipt of the copy of Broin's e-mail to Hall and demanding immediate payment. (Ex. 22)  And, on the bottom of  the copy of the faxed letter from Kraft's attorney that came from Freeman's files, there was a handwritten note, stating:  "1/16/02  Talked to Brenda - she will eliminate LWOP today & see me tomorrow."  (Ex. 22)  Kraft views this note as the "smoking gun."

Freeman acknowledged she made the handwritten note, but testified she could not recall who "Brenda" was or why she wrote the note.   Nevertheless, she claimed she could not have intended to cancel the LWOP because the agreement was a done deal and Kraft was not entitled to payment for the LWOP.

Freeman's testimony on this point was completely lacking in credibility.[3] The more credible reading of the note, particularly in the context of what else was occurring, is exactly what the note states: Freeman talked with Brenda following the receipt of the fax letter from Kraft's attorney, she noted on the letter that a decision was made to eliminate LWOP, and that Brenda would see her tomorrow.

Moreover, the decision to eliminate the LWOP must have been based upon either Freeman's recollection of what the deal was with Kraft or someone reading the settlement agreement at USDA/FSA headquarters and concluding this was what the agreement required. These are the only two reasonable possibilities. In particular, the impetus to cancel the LWOP did not come from Kraft or her attorney because, at that point, neither were aware that the forthcoming payment from the NFC would not include payment for the LWOP. And, consistent with that lack of knowledge, Kraft's attorney's letter of January 16, 2002, upon which Freeman's note was penned, complained only about the delay in payment and made no mention of the LWOP.

12.     While the FSA state office and USDA/FSA headquarters were trying to figure out what to do about the second portion of the back pay payment, unbeknownst to everyone, the NFC had processed the request for payment days earlier and had mailed a check to Kraft in the amount of $919.83, which did not include back pay for the period that Kraft was on LWOP. The credible, albeit circumstantial, evidence is that USDA/FSA headquarters simply dropped the matter once the NFC issued the check rather than going to the trouble of eliminating the LWOP and directing the NFC to issue yet another check.

---

[3] The court does not believe that Freeman was intentionally deceptive. It was apparent from her testimony that the passage of time and her intervening retirement made it difficult for her to recall what actually occurred.

13.    While not explicitly mentioned in the second settlement agreement, the agreement contemplated that the retroactive promotion would be effective for all employment purposes and that the FSA would submit the corrected payroll information to the OPM for use in the calculation of Kraft's disability retirement annuity.  But, to the extent there is any ambiguity in this regard (which there is not), the extrinsic evidence of the settlement discussions and the FSA's post-contract performance confirms this was the understanding of the parties.  As already noted, Freeman provided a calculation of the impact of the retroactive promotion on Kraft's "high-3 average salary" during the negotiations leading up to the agreement.  Likewise, after execution of the agreement, the North Dakota state FSA office forwarded to the Kansas City office a request that it certify the necessary payroll information and forward it to the OPM.  It also requested that the NFC submit the corrected payroll information to the OPM for the portion of the back pay calculated by the NFC.

14.    The record is not entirely clear what the impact would be on the OPM's calculation of Kraft's "high-3 average salary" resulting from the nonpayment of salary during the approximately eight months that Kraft was on LWOP, but it is probable there would be some impact.

15.    Aside from the impact of the nonpayment of the LWOP on the calculation of Kraft's disability retirement annuity, Kraft contends that the OPM has not otherwise fully credited her with the retroactive promotion in its calculation of her "high-3 average salary" and that this is because the USDA/FSA failed to forward all of the corrected payroll information to the OPM.  As to this issue, the evidence is similarly muddled, but the credible evidence is that there is a problem.

In particular, the estimate made by the FSA of the impact of the retroactive promotion upon Kraft's disability annuity prior to Kraft signing the settlement agreement was that she would be

entitled to a monthly gross disability amount of $976 based upon a "high-3 average salary" of $29,287.  (Ex. P-2)  Morever, this calculation was too low because it was based on an outdated pay table.  (Exs. P-2 & D-103)   During the trial, Kraft offered a calculation in Ex. P-31 showing that her "high-3 average salary" would be $31,026 following the same methodology employed by the FSA, but corrected for the revised salary information that the FSA acknowledged in Ex. D-103 was correct.  Kraft also testified that she originally received payment from the OPM based upon a "high-3 average salary" of approximately $28,300, until one small adjustment was made later.   The evidence indicates that this was adjustment set forth in Ex. D-108.

Ex. D-108 is a notice that OPM provided to Kraft on or before January 4, 2002, that her benefits had been recomputed and that her monthly gross payment amount had been increased ten dollars per month for certain past payments and also on a going-forward basis.  More particularly, the notice stated that  Kraft had received gross monthly disability payments of $868 for the period from 3/19/00 through 11/30/00, $890 for the period from 12/01/00 through 11/30/01, and $913 for the period from 12/01/01 through 12/30/01, and that these amounts had been re-computed and increased by ten dollars per month to $878, $900, and $923, respectively. The notice also indicated that the new gross monthly payment, effective January 1, 2002, would be $923.

Ex. D-108 does not state what the ten-dollar increase represents.  But, it appears improbable that it represents the entire impact of the retroactive promotion.  Even the final increase to $923 per month is less than the $976 the FSA estimated using an outdated pay table.  Moreover, it is substantially less than Kraft's calculation of $1,034 per month using the same method as the FSA's estimate, but with the correct payroll figures.

The differences between what is reflected in the OPM's letter, the FSA's estimate based upon outdated pay tables, and Kraft's estimate may be due in part to an adjustment for the monthly cost of a survivor's annuity and also the fact that the FSA's calculation was only an estimate. However, these do not appear to be the entire explanations based upon the court's attempt to reconcile the figures. Consequently, based on the evidence presented by Kraft, which is largely circumstantial but credible, the court's finding is that the OPM has likely not fully included within its "high-3 average calculation" the full amount of the salary increases resulting from the retroactive promotion. What the exact problem is, however, cannot be determined.[4]

The FSA knew the outlines of Kraft's evidence prior to the bench trial and that this was going to be an issue. The court was hoping that it would provide some documentation from the OPM as to what salary information the OPM was using and how the OPM calculated Kraft's "high-3 average salary," particularly if the FSA was going to take the position that it provided all of the correct information and that nothing is wrong. However, no such evidence was presented. Instead, the FSA offered the following to suggest it had fully complied with the agreement:

- The testimony by Jennifer Broin of the FSA state office that she caused Ex. D-111 to be forwarded to the USDA/FSA Kansas City office. As previously noted, Ex. D-111 is the request by the FSA North Dakota state office that the Kansas City office

---

[4] Also, the record on summary judgment contains a more complete copy of the document that the government introduced as Ex. 108. The complete copy has an additional page to the notice along with a cover letter from the OPM dated December 19, 2001 referencing the enclosed notice and stating that it was based on information received from Kraft's employer which had changed her average salary for purposes of computation of her disability annuity from $28,186 to $28,539. See Docket No. 50, Kraft's Statement of Material Facts, Ex. 52. Again, this amount is below both FSA's estimated average calculation of $29,287 based on an outdated pay table and Kraft's calculation of $31,026 based on the correct salary information. Also, see note 2 *supra* regarding a communication from the OPM to Kraft *a year later* on December 18, 2002, suggesting that the OPM had not received all of the salary changes.

certify the corrected payroll information covering the period from March 20, 1999, to October 9, 1999, and transmit the information to the OPM.

- The testimony by Jennifer Broin that she submitted Ex. D-105 to the NFC requesting that it calculate the back pay required for the period from October 10, 1999, through November 3, 2000, and that the NFC certify the corrected payroll information directly to the OPM.

- Ex. D-108, which, as already discussed, is the copy of a notice to Kraft from the OPM giving notice of what amounts to a $10 per month adjustment in certain past and future annuity payments.  The portion of the notice offered by the government is not dated, but it has a fax header from Kraft dated January 2, 2002, which indicates Kraft received it on or prior to that date.

The FSA's argument is that Broin's testimony, coupled with Exhibits D-105 and D-111, proves that the FSA forwarded the necessary information to the OPM, and that the OPM's notice to Kraft of an increase in monthly payments (Ex. D-108) confirms that the information was received and used by the OPM.

The FSA's evidence, however,  fell far short of proving that the OPM actually received the necessary information, much less that it was used in its calculation of Kraft's "high-3 average salary."  The only thing that Jennifer Broin's testimony and Ex. D-111 demonstrated was that she forwarded a portion of the necessary payroll information to the Kansas City FSA office for certification to the OPM, but no proof was submitted that the Kansas City office sent the information to the OPM.  Likewise, the same is true with respect to the request made by Broin to the NFC; no evidence was submitted that the NFC actually sent the necessary information to the OPM.  Finally,

the OPM notice to Kraft (Ex. D-108) does not circumstantially provide the missing link for two reasons. First, the OPM notice was sent sometime before January 2, 2002,[5] and the other evidence indicates that the NFC did not process the necessary payroll changes it was responsible for until January 5, 2002, at the earliest. (Ex. D-106)  More importantly, for the reasons already explained, the mere ten dollar per month increase reflected in the notice does not appear to be consonant with the retroactive promotion given to Kraft dating back three years and substantially impacting her salary for the time period used in the calculation of her "high-3 average salary."

16.     Kraft also contends that the state office used an erroneously high pre-promotion salary amount for the October 1999 time period, that the erroneous amount was transmitted to the NFC, and that the erroneous amount resulted in an underpayment to Kraft in the amount of back pay owed, which was based upon the difference between the new and old salary amounts.  During her testimony, Broin from the FSA acknowledged the erroneous figure in the FSA's summary sheet, but claimed it could not have been the basis for any mistake because the information in the underlying payroll cards was correct.

It does appear that the FSA's summary document contained an erroneously high figure for Kraft's pre-promotion salary in October 1999.  Also, Exhibit D-105 indicates that the summary information was forwarded by the FSA state office to the NFC.   What is not clear, however, is whether the NFC relied upon the erroneous information, since it is just as likely that the NFC computed the portion of the back pay it was responsible for based upon the difference between the new salary figures resulting from the promotion and the amounts of the past payroll it had processed. Nevertheless, for the reasons explained in the conclusions set forth below, the court need not resolve

---

[5]  Most likely it was sent on December 19, 2001.  See note 2, *supra*.

this problem because the relief being granted to Kraft for other reasons will take care of it in any event.[6]

17.     After Kraft's disability retirement application was approved by the OPM and prior to the second settlement agreement, Kraft received a temporary disability payment for the period from March 20, 2000 through November 3, 2000, as part of a check that also included payment of several months of disability retirement benefits after November 3, 2000.  This payment was only a fraction of what  Kraft would have received had she been paid back pay for the time that she was on LWOP through November 3, 2000.  Also, the LWOP issue is important to Kraft to the extent it is has impacted the calculation of her "high-3 average salary" for purposes of her disability retirement annuity.

## CONCLUSIONS OF LAW

The court makes the following conclusions of law:

### 1.0

The FSA has not raised the issue of the court's jurisdiction.  Nevertheless, the court will address the question should it later become an issue.  *See Bilello v. Kum & Go, LLC.*, 374 F.3d 656, 659 (8th Cir. 2004).  But first, the court will provide some explanation of Kraft's claims in the context of the federal law that governs not only her underlying claims, but also the provisions of the second settlement agreement, which is the primary focus of the court's grant of relief.

---

[6]  Part of Kraft's frustration at the time the back pay payments were made, as well as the court's frustration now, is that the FSA never provided a breakdown with the two back pay checks that were issued showing how the amounts were calculated.

From the beginning, Kraft's principal complaint against the FSA was that it failed to provide her with the accommodations necessary to allow her to do her job and that this constituted a violation of the Rehabilitation Act.   Later, Kraft also complained she was the victim of discrimination based upon her age in violation of the ADEA.

As detailed more fully in the court's summary judgment order, Kraft pursued her initial discrimination claims before the EEOC, and, prior to the EEOC issuing a decision, Kraft and the FSA entered into the first settlement agreement in which the FSA agreed to provide Kraft with certain workplace accommodations. Then, when it appeared to Kraft that the FSA had failed to provide the promised accommodations, was retaliating against her for having exercised her rights, and was allegedly engaged in new acts of discrimination, she brought new EEOC complaints.  Prior to any final determination on the new complaints by the EEOC, the FSA once again settled with Kraft.  This time, the FSA gave Kraft, among other considerations,  a retroactive promotion from March 30, 1997, through November 3, 2000, which is the date specified in the agreement as the date of Kraft's disability retirement.  Kraft now claims that she was forced to take disability retirement because of the FSA's failure to provide her with the necessary workplace accommodations.

 Kraft also complains that the FSA breached the second settlement agreement.  Before filing this action, Kraft pursued her claims of breach of the second settlement agreement before the agency and the EEOC.  Pursuant to the "noncompliance" provisions of the second settlement agreement, Kraft sought reinstatement of her underlying civil rights claims or, in the alternative, compliance with the agreement.  The results of this effort were determinations by both the agency and the EEOC that the second settlement agreement had not been breached.

Kraft then filed the present action seeking primarily (1) an order declaring that the FSA had failed to comply with the second settlement agreement, which, under the second settlement agreement, would reinstate her underlying claims, (2) enforcement of her underlying Rehabilitation Act, ADEA, and other claims, and (3) enforcement of her claims for breach of the first settlement agreement, which were left open by the second settlement agreement.   She also alleged that the second settlement agreement should be rescinded based upon fraud.   Finally, she requested enforcement of the second settlement agreement if she would not be allowed the remedy of having it set aside because of either the FSA's alleged noncompliance or the alleged fraud.

The court in its earlier summary judgment order concluded, among other things, that (1) the second settlement agreement was ambiguous and that certain disputed issues of fact may be relevant to determining the meaning of the second settlement agreement, and (2) that reinstatement of Kraft's underlying civil rights claims would not be appropriate given both the government's substantial performance and the availability of another remedy under the "noncompliance" provisions of the settlement agreement, *i.*e., obtaining compliance with the agreement.

For purposes of the court's authority, it is also important to understand (1) that the second settlement agreement was entered into with the assistance of the EEOC and pursuant to the EEOC's regulations that govern settlement of administrative complaints against federal agencies for violations of the Rehabilitation Act, the ADEA, and Title VII;[7] (2) that the second settlement

---

[7] 29 C.F.R. Part 1614 contains the EEOC regulations that apply to federal agencies.  In this case, the assistance provided by the EEOC to the second settlement agreement was both general and case specific.  29 C.F.R. § 1614.603 requires that each federal agency, "make reasonable efforts to voluntarily settle complaints of discrimination as early as possible in, and throughout, the administrative processing of complaints. . . ."  And, specifically, on June 15, 2001, the FSA was instructed to submit its position on settlement, which the FSA did.   On July 30, 2001, the FSA submitted a written offer that contained a number of the terms that were ultimately incorporated in the second settlement agreement. The FSA characterized the offer as follows:

The agency offers the following as an "Offer of Resolution" as per EEOC Regulations 1614.109(c) and Management Directive (MD) 110, Section III, Overview of Revisions to 29 CFR 1614 . . . .

19

agreement resolved complaints pending before the EEOC and prior to its consideration of the

complaints on the merits;[8] (3) that the settlement agreement specifically incorporated the remedies

for agency noncompliance mandated by the EEOC under 29 C.F.R. § 1614.504(a) for settlements

entered into during the EEOC process;[9] and (4) that the FSA executed the agreement with these

understandings and also in contemplation that, ultimately, a federal district court might have to

address any issue of noncompliance.[10]   It is in this context that the court concludes it has the

---

[8]  The second settlement agreement (Ex. P-8) provides in relevant part the following:
This agreement between Ms. Renee T. Kraft and the Farm Service Agency, U.S. Department of
Agriculture, resolves Ms. Kraft's Equal Employment Opportunity Complaint (Agency No. CR-000504
and EEOC Case No. 320-AO-8383X), dated July 20, 2000, except the allegation of a breach of the
Settlement Agreement with the Agency dated October 5, 1999.
. . . .
**Complainant agrees to:**
    a.    Hereby with her EEO Complaint No. CR-000504 and EEOC Case No. 320-AO-
    8383X, and any other pending appeals, complaints, grievances, civil actions, or
    other claims regarding her employment with the Agency, except the allegation of
    a breach of the Settlement Agreement dated October 5, 1999.

[9]  29 C.F.R. § 1614.504 regulates the settlement of EEOC complaints during the EEOC administrative process.
It states that settlements made during the complaint process are binding upon the parties and mandates what the remedies
shall be in the event of agency non-compliance.  Specifically, the two permitted remedies are reinstatement of the
underlying civil rights claims or requiring agency compliance with the agreement; obtaining damage relief is not an
option.  In addition, the section specifies the procedures to be followed for obtaining the permitted remedies - at least
initially.  Finally, the section grants the EEOC the authority to order compliance by a federal agency or reinstatement
of the underlying claims if the EEOC concludes there has been agency non-compliance.
    The second settlement agreement (Ex. P-8) specifically set forth the remedies mandated by § 1614.504 in the
following provision of the agreement:
**Non-Compliance**
    If the terms of this agreement are not carried out, through no fault of the Complainant, she
may request reinstatement of her complaint at the stage where processing stopped just prior to this
agreement, or request complaint with the terms of this agreement by writing to the Director,
Accountability Division, Office of Civil Rights, U.S. Department of Agriculture, Room 607, 7th Street,
S.W., Washington, D.C. 20204.  The request should include a copy of his agreement, an explanation
of which particular term(s) of the agreement have not been implemented, and any relevant documents.
A copy of this request should also be provided to the Agency Representative listed below.

[10]  When Kraft attempted to seek relief from the FSA with respect to her allegations of agency non-compliance,
the USDA issued a written decision denying her claims on June 20, 2003.  The written decision acknowledged that the
agreement was entered into pursuant to the requirements of 29 C.F.R. §§ 1613.603 and 1614.504(a). The decision
referenced the provision of 29 C.F.R. § 1614.504(a) stating  that "any settlement agreement knowingly and voluntarily
agreed to by the parties, reached at any stage of the complaint process, shall be binding upon both parties" and stated
that, in the event of non-compliance by the agency, the specific provisions of 29 C.F.R. § 1614.504, as set forth in the
settlement agreement, applied.  Finally, the written decision spelled out the rights available to Kraft in challenging FSA's

authority under the Rehabilitation Act and/or the ADEA to grant the relief set forth below, both in terms of jurisdiction and an applicable waiver of sovereign immunity.

More specifically, the Rehabilitation Act at 29 U.S.C. § 794a(1) incorporates the remedies, procedures, and rights set forth in Title VII. *E.g.*, *Arneson v. Callahan*, 128 F.3d 1243, 1245 (8th Cir. 1997). In turn, 42 U.S.C. § 2000e-16 governs Title VII's enforcement as to federal agencies. And, included within its provisions is a broad delegation of authority under subsection (b) that gives the EEOC the authority over federal agencies to:

> enforce the provisions of subsection (a) of this section [which prohibits federal agencies from discriminating based on race, color, religion, sex, or national origin] through appropriate remedies, including reinstatement or hiring of employees with or without back pay, as will effectuate the policies of this section, and shall issue such rules, regulations, orders and instructions as it deems necessary and appropriate to carry out its responsibilities under this section.

42 U.S.C. § 2000e-16(b). In addition, following the delegation of enforcement authority to the EEOC under subsection (b) is the grant of jurisdiction under subsection (d) to federal district courts for "civil actions brought *hereunder*" (emphasis added) and reference to the provisions of §§ 2000e-5(f) through (k), which provide for federal district court jurisdiction over private parties.

The ADEA at 29 U.S.C. § 633a(b) similarly gives the EEOC enforcement authority over federal agencies with respect to age discrimination complaints. Also, subsection (c) of 29 U.S.C. § 633a confers upon federal district courts jurisdiction for ADEA enforcement that is equally as broad as the grant of jurisdiction in 42 U.S.C. § 2000(e)-16(d) for Title VII actions, if not broader given the specific language used. In relevant part, subsection (c) states that: "Any person aggrieved may bring a civil action in any Federal district court of competent jurisdiction for such legal or

---

written decision, which included filing an appeal with the EEOC and/or timely filing an action in a United States District Court. See Docket No. 37, Defendant's Statement of Material Facts, Ex. 23.

equitable relief *as will effectuate the purposes of this chapter*."  29 U.S.C. § 633a(c) (emphasis added).

Based on the jurisdiction-conferring provisions of Title VII and the ADEA, it stands to reason that federal district courts have the authority to enforce "pre-decision" settlement agreements involving federal agencies,[11] at least to the same extent as the EEOC, given also:

- the broad authority delegated to the EEOC under Title VII and the ADEA for enforcement of civil rights as to federal agencies;

- the EEOC's reliance upon voluntary settlements in carrying out its enforcement mission, which is in keeping with Title VII's goal of achieving compliance through settlement and voluntary compliance;

- the exercise by the EEOC of the broad authority given to it by Congress over federal agencies for Title VII and ADEA enforcement  in terms of the EEOC's regulations that require federal agencies to make reasonable efforts to settle complaints, that

---

[11]  By "pre-decision" settlement agreement, the court means any agreement that settles complaints filed with the EEOC prior to the EEOC ruling on the merits.  As noted by the cases cited later herein, there are several different flavors of such agreements.  Although  a few courts have drawn distinctions between the different types in terms of whether the agreements are enforceable in federal district court, the more persuasive authority suggests that the differences are immaterial in terms of fulfillment of the statutory objective of obtaining Title VII compliance through voluntary settlement whenever possible.  For example, the Eleventh Circuit in *Eatmon v. Bristol Steel & Iron Works, Inc.*, stated the following with respect to federal court enforcement of the settlement agreement at issue in that case:

> The courts noted that Title VII has been and is to be interpreted in a manner that places emphasis on its remedial purposes, and that "a hyper-technical construction of Title VII is inappropriate." *Liberty Trucking Co.*, 695 F.2d at 1040. *See, e.g.*, *Zipes*, 455 U.S. at 397, 102 S.Ct. at 1134. The courts concluded that the emphasis in Title VII on conciliation and the legislative history of Title VII indicate that Congress intended Title VII to be enforced primarily through conciliation and voluntary compliance. *Cf. Alexander v. Gardner-Denver Co.*, 415 U.S. 36, 44, 94 S.Ct. 1011, 1017, 39 L.Ed.2d 147 (1974) ("Cooperation and voluntary compliance were selected as the preferred means for achieving this goal"). The courts determined it would be antithetical to Congress' strong commitment to conciliation if there were no federal forum for enforcement of conciliation agreements.

769 F.2d 1503, 1509 (11th Cir. 1985); *see also Francisco v. Principi*, 2001 WL 563793 at *2-3 (N.D. Ill. 2001) (discussed further in note 12 below).

dictate the remedies that will apply in the event of agency noncompliance, and that grant the EEOC the authority to enforce agency noncompliance; and

- the other provisions of Title VII and the ADEA that provide for and encourage resolution of discrimination claims by the EEOC process, but which also allow federal employees the right to be heard in federal district court if dissatisfied with the outcome.

In this context, requiring federal agencies to comply with settlement agreements entered into under the EEOC's guidance and regulation most certainly promotes "the purposes" of the ADEA within the language of 29 U.S.C. § 633a(c) that confers jurisdiction upon the federal district courts. Likewise, a claim for agency noncompliance would be an action brought "hereunder" within the meaning of Title VII's § 2000e-16(d) grant of jurisdiction to federal district courts - particularly given the authority granted the EEOC under § 2000e-16 over federal agencies and the EEOC's implementing regulations.

For many of the same reasons, a number of other courts have concluded that federal district courts have authority under Title VII to enforce "pre-decision" settlement agreements entered into by federal agencies during the EEOC process. *Francisco v. Principi*, 32 Fed.Appx. 141, 2002 WL 411457 *2 (4th Cir. 2002) (holding that "the district court correctly determined that it had jurisdiction to enforce the parties' settlement agreement" in an unpublished opinion involving a suit to enforce a pre-decision Title VII settlement agreement involving the United States Department of Veteran Affairs and *citing Ruedlinger v. Jarrett*, 106 F.3d 212, 215 (7th Cir.1997)), *aff'g* 2001 WL 563793

23

(N.D.Ill. 2001);[12] *Lee v. United States*, 33 Fed.Cl. 374, 378-380 (2005); *Griswold v. United States*, 61 Fed.Cl. 458, 461-465 (2004); *Freeman v. Potter*, 2006 WL 2631722 *1-2 (W.D. Va. 2006) (holding that "[a]ctions to enforce Title VII settlement agreements are Title VII actions" and awarding damages and attorney's fees for violation of a Title VII settlement agreement by the Postmaster General); *Frahm v. United States*, 2005 WL 1528421 *2 (W.D. Va. 2005) (concluding that Title VII confers jurisdiction, but denying claim for monetary damages because not permitted by 29 C.F.R. § 1614.504), *aff'd*, __F.3d __, 2007 WL 1829176 (4th Cir. 2007) (affirming the dismissal of the monetary damage claim on the grounds that the government had not waived its

---

[12]   The district court in *Francisco v. Principi* concluded the following:

> The district court instructed the parties to brief the issue whether enforcement of pre-determination settlement agreements FN2 is within its jurisdiction. Upon reviewing the parties' briefs in support of jurisdiction, the Court has found that such enforcement is within its jurisdiction.
>
> > FN2.  A pre-determination settlement agreement is "a contract between a complaining employee and the allegedly discriminatory employer that is reached with the aid of the EEOC prior to an EEOC determination of the merits of the complaining employee's charge of discrimination." *Brewer v. Muscle Shoals Bd. of Educ.*, 790 F.2d 1515, 1519 (11th Cir.1986).
>
> The Seventh Circuit has held that Congress intended to provide the EEOC with a federal forum to enforce conciliation agreements. *EEOC v. Liberty Trucking Co.*, 695 F.2d 1038, 1040 (7th Cir.1982). Although the Liberty Trucking court did not "reach the question whether a distinction should be made between conciliation agreements, which are statutory creatures and which follow an EEOC investigation and determination of reasonable cause, and settlement agreements which are a device created by the EEOC to resolve complaints prior to investigation," the Court noted that its decision "turn[ed] on the voluntary nature of conciliation agreements and not upon an administrative finding of reasonable cause." Id. at 1044 n. 7. Recognizing that settlement agreements are just as effective as conciliation agreements in promoting voluntary compliance with Title VII, other courts have held actions to enforce pre-determination settlement agreements are ones brought under Title VII and accordingly, federal courts have jurisdiction over such actions. *Eatmon v. Bristol Steel & Iron Works, Inc.*, 769 F.2d 1503, 1513 (11th Cir.1985); *EEOC v. Henry Beck Co.*, 729 F.2d 301, 305-06 (4th Cir.1984); *Sherman v. Standard Rate Data Serv., Inc.*, 709 F.Supp. 1433, 1440 (N.D.Ill.1989).
>
> > The Court finds *Liberty Trucking* instructive and *Eatmon*, *Beck*, and *Sherman* persuasive. Because the Court sees no reason to differentiate between conciliation and settlement agreements as they relate to jurisdiction, the Court holds that it has jurisdiction over Francisco's claim that the DVA breached the pre-determination settlement agreement.

2001 WL 563793 at *2-3.

sovereign immunity and, alternatively, because monetary damages are not a permitted remedy under 29 C.F.R. § 1614.504);[13] *Robles v. United States,* 1990 WL 155545 (D.D.C 1990).

Also, in addition to the cases that have specifically found federal district court jurisdiction for the enforcement of pre-decision settlement agreements involving federal agencies, there are cases in which federal courts have assumed *sub silentio* that jurisdiction exits by addressing the merits of the claims either at the district court level or on appeal, or both. *Bowden v. United States*, 106 F.3d 433, 439-440 (D.C. Cir. 1997) (remanding claim for breach of Title VII settlement agreement by a federal agency to the district court for further action after the district court had dismissed the case following a transfer to the Court of Federal Claims and a re-transfer back to the district court); *Wilmes v. U.S. Postal Service*, 810 F.2d 130 (7th Cir. 1987); *America v. Preston*, 468 F. Supp. 2d 118 (D.D.C 2006); *Garvin v. Postmaster, United States Postal Service*, 553 F.Supp. 684 (E.D. Mo. 1982); *Shaw v. Library of Congress*, 479 F. Supp. 945 (D.D.C., 1979), *aff'd on other grounds*, 747 F.2d 1469 (D.C.Cir. 1984), *rev'd on other grounds*, 474 U.S. 815 (1985) (reversed award of interest on attorney's fees without mention of any lack of jurisdiction by the district court).

Finally, a number of courts have analogously concluded that federal district courts have jurisdiction under Title VII to address breaches of pre-decision settlement agreements that involve

---

[13] There is one sentence in the Fourth Circuit's decision in *Frahm* in which the court states that the employee's claim was properly dismissed because neither Title VII nor the settlement agreement authorized suit for breach of the settlement agreement. This statement was made, however, in summary to the court's more specific discussion about the lack of a waiver of sovereign immunity for monetary damages, which was the claim that the district court dismissed. And, while it is not entirely clear, it appears that the court's use of the more general language was not intended to go beyond the more specific point of there being a lack of a waiver of sovereign immunity for a claim for monetary damages. But, even if the court intended to say that there was no waiver of sovereign immunity for any suit for breach of the settlement agreement, as opposed to more narrowly no waiver as to a claim for monetary damages, the contract language in *Frahm* was different from the language in this case and only allowed reinstatement of the underlying civil rights claims, which the court did not have to address in terms of enforcement since the relief being sought was a claim for monetary damages. Hence, the Fourth Circuit did not address the question of whether a contract containing remedies for agency non-compliance mandated by federal regulation would provide the necessary waiver of sovereign immunity for an action seeking to enforce one of the mandated remedies.

private parties. *Ruedlinger v. Jarrett*, 106 F.3d 212, 215 (7th Cir.1997); *Eatmon v. Bristol Steel & Iron Works, Inc.*, 769 F.2d 1503, 1508-1513 (11ᵗʰ Cir. 1985); *E.E.O.C. v. Henry Beck Co.*, 729 F.2d 301, 303-305 (4th Cir. 1984); *Vasquez v. Salomon Smith Barney Inc.*, 2003 WL 21242902 (S.D.N.Y. 2002) (stating it is "well settled . . . that an action to enforce a settlement agreement entered into to resolve a charge of employment discrimination that has been filed with the EEOC is brought directly under Title VII" and citing cases).

In concluding that there is jurisdiction under Title VII and/or the ADEA, the court notes the authority that suggests the contrary. *E.g.*, *Hansson v. Norton*, 411 F.3d 231, 234-236 (D.C. Cir. 2005); *Taylor v. United States*, 73 Fed.Cl. 532 (2006); *cf. Morris v. City of Hobart*, 39 F.3d 1105, 1111-12 (10ᵗʰ Cir. 1994). Several of the courts taking a contrary view have relied on the United States Supreme Court's decision in *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994), which held that the federal court's jurisdiction in that case did not extend to the enforcement of a settlement agreement disposing of the case. *Kokkonen*, however, is distinguishable.

In *Kokkonen*, Guardian Life Insurance Company terminated Kokkonen's general agency agreement. Kokkonen sought relief by filing suit in state court asserting state-law claims, and Guardian Life removed the case to federal district court asserting diversity jurisdiction. While the case was pending in federal district court, the parties settled and stipulated to a dismissal of the action pursuant to Fed. R. Civ. P. 41(a)(1)(ii). Thereafter, a dispute arose over the settlement, and Guardian Life brought a motion seeking to enforce the settlement agreement. The district court entered an enforcement order, which the district court, and later the Ninth Circuit, concluded it had the inherent power to do. The Supreme Court, however, disagreed and held that the district court lacked the necessary authority to enforce the settlement agreement, stating that the jurisdiction over

the initial claims did not extend to the breach of the settlement agreement, which it viewed to be a separate contractual matter. 511 U.S. at 381-382. The Supreme Court observed in passing, however, that the district court could have retained jurisdiction over enforcement of the settlement agreement by reserving its jurisdiction as part of the dismissal order. *Id.*

The situation presented here is substantially different from that in *Kokkonen*. In *Kokkonen*, the settlement agreement was entered into while the case was pending in federal district court, the claim for enforcement did not arise until after the federal district court dismissed the case, and the case did not involve a settlement agreement that was governed by federal law. *E.g.*, *Langley v. Jackson State University*, 14 F.3d 1070, 1073 (5th Cir. 1994) (noting distinctions and distinguishing prior Fifth Circuit precedent holding that Title VII confers jurisdiction for enforcement of Title VII conciliation agreements); *Griswold v. United States*, 61 Fed.Cl. at 463 (distinguishing *Kokkonen* from enforcement of Title VII settlement agreements).

This case, on the other hand, involves a claim for enforcement of a pre-decision settlement made during the EEOC process for which Title VII and the ADEA grant jurisdiction to federal district courts to enforce for the reasons already articulated. *See id.* In fact, to the extent there is any basis for drawing an analogy to *Kokkonen* (which is difficult to do given the dissimilarity of the facts and applicable law), it is not to the ultimate conclusion in *Kokkonen*, but rather to its observation that district courts can retain jurisdiction over enforcement of settlement agreements by making provision for the retention of jurisdiction in the orders for dismissal. Essentially, in terms of pre-decision settlement agreements, the retention of jurisdiction is accomplished by Title VII and its implementing regulations that dictate the remedies upon agency noncompliance, that provide for enforcement by the EEOC, and that also provide for federal district court enforcement.

27

Some courts that have taken the contrary position with respect to Title VII jurisdiction over enforcement of pre-decision settlement agreements involving federal agencies have concluded that jurisdiction properly rests, instead, with the Court of Federal Claims under the Tucker Act if the amount of monetary relief being sought is in excess of $10,000. *Hansson v. Norton*, 411 F.3d at 236-237; *Taylor v. United States, supra.* The decisions so holding, however, are less than clear as to which court (if any) would have jurisdiction when the Court of Federal Claims does not because the primary relief being sought is not money damages and the statutory limitations on the jurisdiction of the Court. *See id.*

Also, the individual judges of the Court of Federal Claims have reached contrary conclusions as to whether Title VII provides federal district courts with authority to enforce Title VII settlement agreements and whether the Court of Federal Claims has any jurisdiction. *Compare Taylor v. United States, supra*, (discussing the divergence of opinions among the judges of the Court of Federal Claims as to whether jurisdiction exists under Title VII for enforcement of pre-determination settlement agreements and holding that jurisdiction exists if the claim is primarily for money damages) *with Griswold v. United States*, 61 Fed.Cl. at 461-465 (no jurisdiction over Title VII settlement agreements); *Lee v. United States*, 33 Fed.Cl. at 378-380 (same). The Court of Federal Claims decisions holding that it does <u>not</u> have jurisdiction over claims for breach of Title VII settlements have concluded that Title VII's comprehensive enforcement scheme, including the grant of jurisdiction to the federal district courts, forecloses jurisdiction for the Court of Federal Claims under the Tucker Act. *See id.* Moreover, even if jurisdiction exists in the Court of Federal Claims for breaches of some Title VII settlement agreements, the Court of Federal Claims has made clear that it does not have jurisdiction over enforcement of settlement agreements, like the one involved

28

in this case, for which the only permitted remedies are reinstatement of the underlying claims or requiring the agency compliance because neither is primarily a damage remedy. *Schnelle v. United States*, 69 Fed.Cl. 463 (2006); *see Taylor v. United States*, 73 Fed.Cl. at 545-547.[14]

Finally, as to the issue of whether Title VII and/or the ADEA confer the necessary authority to enforce the pre-decision settlement agreement in this case, the court is governed by the Eighth Circuit's view of the matter. While the court is not aware of any case in which the Eighth Circuit has addressed the issue specifically, it has recently affirmed a Title VII decision in which the district court concluded on the merits that the pre-decision settlement agreement, which provided the same alternative remedies for breach as the agreement in this case, had not been breached. In reaching its decision, the court observed:

> A plaintiff alleging that the government failed to comply with the terms of a Title VII Negotiated Settlement Agreement can "request that the terms of the settlement agreement be specifically implemented or, alternatively, that the complaint be reinstated." 29 C.F.R. § 1614.504(a).

In making this observation and sustaining the decision of the district court on the merits, the court did not question its jurisdiction to hear the appeal even after it cited for other purposes its decision in *Gilbert v. Monsanto Co.*, 216 F.3d 695 (8th Cir. 2000) in which the court had addressed the issue of jurisdiction with respect to a claim for enforcement of a settlement agreement in a different context.

---

[14] The unfortunate part about the confusion existing in some circuits is the number of cases that have bounced back and forth between the federal districts courts, the Court of Federal Claims, and the appellate courts in an attempt to grapple with the jurisdictional questions. *Bowden v. United States*, *supra* (district court to the Court of Federal Claims, then back to district court, which dismissed, then to the D.C. Circuit, which remanded back to the district court and observed that the government had made contrary arguments before the district court and the Court of Federal Claims as to which court had jurisdiction); *Taylor v. United States*, *supra* (district court to the Court of Federal Claims, then ordered transferred back to the district court); *Griswold v. United States*, *supra* (Court of Federal Claims to the federal district court, then back to Court of Federal Claims, then ordered re-transferred back to the federal district court).

**2.0**

But, even if the Rehabilitation Act (incorporating the rights and remedies of Title VII ) and/or the ADEA does not grant the court the power to enforce the second settlement agreement, the court has jurisdiction over (1) Kraft's substantive claims under those acts, including the authority to construe the second settlement agreement to determine the legitimacy of the government's affirmative defense that the claims are barred by the second settlement agreement, and/or (2) Kraft's claims for rescission of the settlement agreement based upon fraud. And, since Kraft's alternative claim for enforcement of the second settlement agreement is factually interdependent with and ancillary to these claims, which the court disposed of on summary judgment, the court has the authority to address the remaining claims for enforcement of the second settlement agreement under the doctrine of ancillary jurisdiction. *See Rochon v. Gonzales*, 438 F.3d 1211, 1215 (D.C. Cir. 2006); *Taylor v. United States*, 73 Fed.Cl. 532 (2006); *Munoz v. England*, 2006 WL 3361509 *5 n.2 (D.D.C. 2006).

**3.0**

Settlement agreements are a species of contract. Consequently, in the absence of particular statutory requirements, general contract principles govern the resolution of disputes involving settlement agreements. *See, e.g.*, *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975); *Myers v. Richland County*, 429 F.3d 740, 745 (8th Cir. 2005).

**4.0**

Federal common law governs the interpretation of a contract to which the United States is a party. *E.g.*, *United States v. Seckinger*, 397 U.S. 203, 209-210 (1970). It looks to the best law as set forth in the modern decisions of the federal and state courts, *e.g.*, *United States v. Basin Electric*

30

*Power Cooperative*, 248 F.3d 781, 796 (8th Cir. 2001); *A.W.G. Farms, Inc. v. Federal Crop Ins. Corp.*, 757 F.2d 720, 726 (8th Cir.1985), and takes into consideration traditional rules of contract construction, *e.g.*, *United States v. Seckinger*, 397 U.S. at 209-21; *Bull v. U.S.*, 65 Fed. Cl. 407, 412 (2005); *Harrison Western Corp. v. United States*, 792 F.2d 1391, 1393 (9th Cir.1986).

A fundamental objective in construing a contract is to give effect to what were the mutual intentions of the parties at the time the contract was made. *E.g.*, *United States v. Basin Electric Power Cooperative*, 248 F.3d at 805; *see generally Restatement (Second) of Contracts* §§ 200-201; 17A Am. Jur. 2d *Contracts* § 350-352. But, if it appears the parties construed the language differently, the court must then determine whose construction prevails assuming there is sufficient assent to have an agreement. *See id*.

In interpreting the contract language, the court must give the words of the agreement their ordinary meaning, unless the parties mutually intended some other meaning, and to interpret the contract in a way that gives effect to all of its provisions. Along the way, there may be other principles of contract interpretation that have to be relied upon, including, for example, consideration of the subject matter, nature, and purpose of the contract. *See generally Restatement (Second) of Contracts* § 202; R. Lord, 11 *Williston on Contracts* § 30:2 (4th ed.) ("*Williston on Contracts*"); 17A Am. Jur. 2d *Contracts* §§ 354, 359, 385-386.

There is some tension in the cases applying federal common law as to how willing a court should be to look beyond the agreement in determining whether an ambiguity exists. Some courts take the position that, as a matter of normal course, a court should consider the circumstances in which the agreement is made, the interpretations proffered by the parties, and, on a conditional basis, the extrinsic evidence proffered by the parties to support their interpretations. *See, e.g., In re New*

*Valley Corp.*, 89 F.3d 143, 149-150 (3rd Cir. 1996); *see generally* 11 *Williston on Contracts* § 30:5; E. Farnsworth, *Farnsworth on Contracts* §§ 7.10-7.14 (3rd ed. 2004) ("*Farnsworth on Contracts*").[15] Other courts take the position that the primary focus should be upon the language of the agreement, and how that language would be understood in its ordinary and popular sense, and that matters outside the agreement (particularly extrinsic evidence of prior negotiations) should be looked to only in limited situations, such as when it is clear the parties intended the language to be understood in a technical sense or when there is evidence of a "latent ambiguity."  *See, e.g., Air Line Pilots Ass'n, Intern. v. Midwest Exp. Airlines, Inc.*, 279 F.3d 553, 556 (7th Cir. 2002); *Funeral Financial Systems v. United States*, 234 F.3d 1015, 1018 (7th Cir. 2000).

In the more recent cases in which the Eighth Circuit has applied federal common law, it appears to have followed the more expansive approach, at least to the extent of considering evidence of the surrounding circumstances and the interpretations that have been proffered by the parties. *See, e.g.,  United States of America v. Basin Electric Power Cooperative*, 248 F.3d at 804-805; *John Morrell & Co. v. Local Union 304A of United Food and Commercial Workers, AFL-CIO*, 913 F.2d 544, 551 (8th Cir. 1990).

### 5.0

In this case, one of the disputes is whether the FSA breached the second settlement agreement by not paying back pay for the time that Kraft was on LWOP.   As noted earlier, the

---

[15]  The  use of extrinsic evidence to determine whether there is an ambiguity does not mean that the evidence can later be used to vary the terms of the agreement if the court determines the agreement to be unambiguous.  *See, e.g., Brobeck, Phleger & Harrison v. Telex Corp.*, 602 F.2d 866, 871-872 (9th Cir. 1979) (extrinsic evidence should be considered conditionally to determine whether an agreement is ambiguous under California law, but may not be used to vary the terms of the agreement if it is found to be unambiguous).

agreement, in relevant part, first provides for the payment of back pay through November 3, 2000, in the following language:

> Promote Complainant to a CO-7/5 effective March 30, 1997, with back pay through November 3, 2000, date of Complainant's disability retirement. Complainant will be granted a Within-Grade-Increase to a CO-7/6 effective April 11, 1999.

The agreement also provides, however, that:

> All leave taken between February 3, 2000, and November 3, 2000, will remain as annotated on Complainant's T&A's [*i.e.*, time and attendance sheets].

Consequently, the issue is whether the affirmative promise to pay back pay through November 3, 2000, is trumped by the language of the second clause that "all leave taken between February 3, 2000, and November 3, 2000, will remain as annotated" on Kraft's time and attendance sheets.

But, what does "remain as annotated" mean, particularly in the context of the earlier language stating that back pay will be paid through November 3, 2000? Does it mean, as the FSA now suggests, that LWOP during this time period will not be compensated, even though the language does not explicitly say that? Or does the language serve some other rational purpose consistent with payment of back pay through November 3, 2000, including while Kraft was on LWOP, as Kraft suggests?

Kraft's proffered construction (as well as her understanding at the time of execution of the agreement as discussed in the court's findings) is that the agreement required the payment of back pay through November 3, 2000, as the first clause states, and that the second clause was inserted simply to foreclose her from being paid twice for the paid leave she had already taken. In other words, the promise to pay back through November 3, 2000, did not include restoration of the annual and sick leave that Kraft had used, which, if restored, would have entitled her to further

compensation since FSA's policy was to pay for unused annual and sick leave at the time of separation.  Or, to put it yet another way, the leave taken would "remain annotated" in the sense that the back pay would not have to be paid for those days of annual and sick leave for which Kraft had already been paid, except for the differential between what she was paid and the pay at the new rate based on the retroactive promotion.

Considering first the language of the agreement, Kraft's proffered interpretation is reasonable given the lack of clarity in the  language "leave will remain as annotated," the lack of explicit language stating that no payment would be made for the LWOP, and, most important, the affirmative promise that back pay would be paid through November 3, 2000.  Kraft's construction is also reasonable when considering the undisputed evidence of the circumstances in which the agreement was made - at least viewed from her perspective.  Kraft's contention at the time of settlement was that the FSA was responsible for her not working up to the time she took a disability retirement on November 3, 2000, because of its alleged failure to live up to the terms of the first settlement agreement and provide the accommodations that would have allowed her to continue working.  Consequently, she believed she was forced into taking LWOP in violation of statutory rights and that she was entitled to payment for this time.

Also, the parties were aware at the time of the execution of the agreement that Kraft had exhausted her sick and annual leave on March 20, 2000, and that she was on LWOP for the next approximately eight months through the effective date of her disability retirement on November 3, 2000.  In view of these circumstances, the fact the language provided for payment of back pay through November 3, 2000, instead of the earlier date of March 20, 2000, when Kraft started on LWOP, also supports the reasonableness of Kraft's construction.

The FSA's proffered construction of the second clause is that Kraft is not entitled to payment for any of the time that she was on leave, including the time she was on LWOP. This is also a rational interpretation in the sense that, if the LWOP "remains annotated," the agreement can be read as permitting the FSA not to pay for that time, despite its agreement generally to pay back through November 3, 2000. Also, the FSA's interpretation finds some support in the surrounding circumstances, at least viewed from its perspective. The FSA's view was that Kraft's leaving work was not its fault; hence, it would not have agreed to pay for work Kraft did not perform. Further, by the time of the execution of the agreement, Kraft had received temporary disability payments from OPM dating back to March 20, 2000, albeit at only a fraction of her normal salary.

Because the contract language is susceptible to multiple reasonable interpretations, particularly in view of the undisputed evidence as to the circumstances in which the agreement was made, the court concluded in its earlier order upon summary judgment that the agreement is ambiguous as to the LWOP issue. Also, at that time of summary judgment, Kraft proffered additional evidence relating to pre-contract negotiations and post-contract performance that appeared to be relevant to the construction of the agreement. Because this evidence was disputed, the court concluded that a final decision regarding the agreement's meaning should be deferred until a trial could be held to consider the disputed evidence. *See* J. Perillo & M. Kniffin, 5 *Corbin on Contracts* § 24.10 (1998) ("*Corbin on Contracts*").

Unfortunately, the evidence presented during the bench trial did not show a "meeting of the minds" regarding whether the back pay to be paid through November 3, 2000, encompassed the period of time that Kraft was on LWOP. Rather, the evidence presented confirmed the existence of the ambiguity and, if anything, made more plausible Kraft's interpretation.

With respect to the evidence of the pre-agreement negotiations, the court was unable to determine whether the parties specifically discussed the issue of payment for the LWOP, or whether more general language was used to describe the deal from which both parties took away different meanings.   In Kraft's favor, however, there was no credible evidence that Freeman, or anyone else from the government, clearly communicated to Kraft that she would not be paid for the LWOP. Further, it was also clear that Kraft genuinely believed at the time she entered into the agreement that the promise to pay back through November 3, 2000, including the time she was on LWOP.[16]

With respect to the post-execution performance, the credible evidence is that Freeman decided in January 2002, some four months after the execution of the agreement, that she was going to eliminate the LWOP from Kraft's record and compensate Kraft for this time.  This decision was made in the context of trying to get the NFC to process the back pay check for the period that included the time that Kraft was on LWOP.    Ultimately, the decision was not carried out, most likely because the delayed check from the NFC finally arrived, sans payment for the LWOP, so the FSA just dropped the matter.  Whether Freeman's post-execution decision to eliminate the LWOP was because Freeman believed this was the deal all along, or whether it was because she (or possibly others) concluded post-agreement that this was what the agreement actually required, the court cannot say with any certainty.   However, the possibility of the former could not be eliminated, and, if it was the latter, it simply reinforces the court's conclusion regarding the agreement's ambiguity. As discussed in the court's findings, these were only two reasonable possibilities.

_____

[16]   At trial, Broin claimed it was FSA's practice not to pay back pay for time that had not been worked.  If so, the credible evidence was that this was never communicated to Kraft.  Broin also claimed that payment for time not worked is not "back pay."  While that may be her understanding, the court is not aware of any such limitation in the use of the term.  Moreover, there is nothing wrong, conceptually or otherwise, in providing back pay for the time a person has not worked because of the fault of another or as part of a settlement.

**6.0**

In the absence of relevant extrinsic evidence explaining the ambiguity, the court turns to the doctrine of *contra proferentem* to resolve the matter. Under this well-established rule of construction, the court can construe contract language that is susceptible to multiple meanings against the drafter. *See generally Restatement (Second) of Contracts* § 206; *Corbin on Contracts* § 24.27. And, the fact that the drafter is the federal government does not make a difference since the doctrine of *contra proferentem* applies to it as well. *United States v. Seckinger*, 397 at 210.

In this case, Freeman from the USDA/FSA drafted the agreement after a general discussion between the parties regarding the outlines of the deal and Kraft later merely assented to it. Given the nature of the dispute and the manner in which the written agreement was developed, application of the doctrine of *contra proferentem* is appropriate in this case.[17] Consequently, the court construes the agreement in Kraft's favor as requiring the payment of back pay through November 3, 2000, including the time that Kraft was on LWOP.

**7.0**

As a consequence of determining that the FSA did not pay the full amount of back pay required by the agreement, the court also concludes that the FSA failed to comply with all of the requirements of the second settlement agreement. This conclusion, in turn, brings into play the

---

[17] The government argues that applying Kraft's construction compensates Kraft for work she did not perform and argues, essentially, that this would not be in the public interest. Another well-established rule of construction is that, all things being equal, the construction that serves the public interest should be preferred. *See Mastrobuono v. Shearson Lehman Hutton, Inc.*, 514 U.S. 52, 62 (1995); *United States v. Seckinger*, 397 U.S. at 211-213; *see generally Restatement (Second) of Contracts* § 207; *Corbin on Contracts* § 24.25. However, such an argument ignores the fact that, in settling her dispute with the government, Kraft gave up her civil rights claims, including specifically her claim that, but for the government's alleged unlawful conduct in not accommodating her claimed disabilities, she would have been able to continue working. As the federal civil rights acts make clear, compensating persons who have been deprived of their rights is also in the public interest. Thus, when viewed in this context, providing compensation for the period of time Kraft was on leave without pay would not be contrary to the public interest such that it should cause the court to favor the government's interpretation of the agreement.

agreement's provisions for agency noncompliance, which were dictated by 29 C.F.R. § 1614.504(a).

Under the noncompliance provisions, Kraft is entitled to either reinstatement of her claims or compliance by the FSA with the terms of the agreement. For reasons articulated in the court's prior order on summary judgment, the court believes that requiring the FSA to comply is the more appropriate remedy given the government's substantial compliance with the other provisions of the agreement.[18] Consequently, this is the remedy that the court will order under the assumption the court has the power to grant the remedy. However, if it should later be held that the court lacks this authority, the court's reluctant conclusion is that Kraft would be entitled to reinstatement of her underlying claims leading up to both the first and second settlement agreements.

Since part of the remedy that Kraft is entitled to is expungement of the LWOP and back pay for the time she was on LWOP from March 20, 2000 through November 3, 2000, the court will permit the government to offset from the amount of back pay to be paid the amount of the temporary disability payment she received that is attributable to the period prior to and including November 3, 2000, which may be less than the amount of the first disability check to Kraft if it included, in

_____

[18] The court noted in its prior order that Kraft was given a retroactive increase in grade and rank; she was paid separate lump-sum amounts for much of the back pay that was required along with a small cash settlement amount; she was paid attorney's fees; and she was given retroactive adjustments in grade and rank that were to be used to increase the effective amount of her disability annuity. In comparison, the alleged items of noncompliance are a smaller part of the bargained-for performance.

There is nothing in 29 C.F.R. § 1614.504(a) that allows the person aggrieved by a federal agency's noncompliance to elect reinstatement no matter what the circumstances. Consequently, the court believes that ordinary contract principles should apply in determining which remedy is the most appropriate in a given case. It is basic hornbook law that rescission is not appropriate when the performance by the breaching party has been substantial and there has not been a total failure of consideration. *See, e.g., P.L.A.Y., Inc. v. NIKE, Inc.*, 1 F. Supp. 2d 60, 65 (D.Mass. 1998) (recession for failure of consideration is appropriate when the failure goes to the essence of the agreement but not when the defaulting party's performance has been substantial); *see generally* 17 Am. Jur. 2d *Contracts* §§ 578, 631; 17B C.J.S. *Contracts* §§ 456, 477; *Farnsworth on Contracts* § 4.11; cf. *Realex Chemical Corp. v. S.C. Johnson & Son, Inc.*, 849 F.2d 299, 302-303 (8th Cir. 1988) ("Substantial performance occurs where less than full and exact performance is rendered, but where there is, nevertheless, sufficient performance to allow the breaching party the benefit of the bargain.").

part, the time period after November 3, 2000.   This is to avoid Kraft receiving a windfall to which she is not entitled.   *Cf.  Lary v. United States  Postal  Service*, 472 F.3d at 1369-70.

**8.0**

While the evidence presented by Kraft was largely circumstantial, and by no means overwhelming, the court also concludes that the FSA failed to appropriately forward to the OPM all of the revised salary information resulting from the retroactive promotion.   Kraft contends she has suffered damage as a result of the wrong information having been submitted and the delay in the submission of that information to the OPM.   The court concludes, however, that any damage relief being sought by Kraft is not permitted by the terms of the second settlement agreement, which limits relief for noncompliance to either reinstatement of the underlying claims or compliance.   And, having concluded that reinstatement is not the appropriate remedy in this case, the court will order that the FSA resubmit the salary information resulting from the promotion granted by the second settlement agreement to the OPM and confirm with the OPM that it has received the information as means of enforcing compliance with the agreement.

**9.0**

Kraft contends that the FSA breached the second settlement agreement by failing to pay the back pay within 30 days of the date of the agreement.   The FSA takes the position that it was only required to process the paperwork it was responsible for within 30 days, but no promise was made when others in the federal bureaucracy would act given the FSA's lack of control over them and problems encountered by the FSA in settling other cases.   The FSA claims this was the reason for the particular language in the agreement that makes reference in several places to the FSA processing the paperwork or personnel changes with the 30-day time period rather than promising

payment within that time.  While the matter is not without doubt, the court concludes that the agreement only required the FSA to process the paperwork for the personnel change, the payment of the attorneys fees, and the small lump sum payment within the 30 days and that the 30-day time limit did not apply to the work required to be performed by the NFC, a separate agency albeit part of the USDA, or the actual issuance of the checks.

This does not mean, however, that the FSA had an unlimited amount of time in which to comply.  In this case, the evidence is that the NFC issued the last check on or about January 7, 2002, some four months after the agreement was made.  While this may be on the outer bounds of reasonableness, the court concludes that it was not a breach of the agreement.

**10.0**

Kraft claims that the FSA also breached the second settlement agreement by not paying interest on the back pay that the FSA agreed to pay consistent with the retroactive promotion, through the date of payment.  The express language of the settlement agreement, however, did not provide for the payment of interest, and the court construes the agreement as not requiring it.

Kraft contends, nevertheless, that the FSA was required to pay the interest pursuant to the Back Pay Act codified in relevant part at 5 U.S.C. § 5596(b).  In this case, however, the back pay amounts agreed to by the USDA were without any finding by the EEOC or other authority that the same must be paid.  Thus, it does not appear that either the Back Pay Act or 5 C.F.R. § 550.805, which was also cited by Kraft, applies in this case.  *See Bowden v. United States of America*, 106 F.3d 433, 440-441 (D.C. Cir.1997) (interest not due under the Back Pay Act when the amount paid was not mandated by "appropriate authority" within the meaning of the Act).

**11.0**

Kraft also seeks damages relating to certain amounts she borrowed to pay expenses allegedly incurred as a result of the breach of the settlement agreement.   Because the second settlement agreement and 29 C.F.R. § 1614.504(a) do not provide for the  recovery of damages in the event of agency noncompliance, these damage items are denied.  Also, the court doubts the claimed damages would have been within the contemplation of the parties and the proper subject of an award of damages, even if the remedies for breach had not been limited.

**12.0**

As previously noted, the Rehabilitation Act incorporates Title VII's remedies, which now includes a specific waiver of sovereign immunity on the part of the United States to pay prejudgment interest.  *E.g., Trout v. Secretary of the Navy*, 317 F.3d 286, 289 (D.C. Cir. 2002); *Estate of Reynolds v. Martin*, 985 F.2d 470, 472 (9th Cir. 1993); 42 U.S.C. § 2000e-16(d).  In this case, the fact that one or more of Kraft's claims allowed for the collection of prejudgment interest provides the requisite waiver of sovereign immunity for its imposition here.  Further, requiring that the FSA pay interest on the back pay to be paid through November 3, 2000, including the time that Kraft was on LWOP, is consistent with the compliance remedy set forth in the agreement and mandated by 29 C.F.R. § 1614.504(a).  Given the passage of time, the only way that anything approximating full compliance can be achieved is for the court to order that prejudgment interest be paid on the amount required to bring the FSA into compliance.[19]  *Cf. Lary v. United States Postal Service*, 472 F.3d 1363, 1369

---

[19]   While in other contexts the payment of prejudgment interest is a damage remedy, here the payment of prejudgment interest is part of the relief being granted pursuant to statute in order to achieve FSA's full compliance with the agreement.  Consequently, it is an equitable remedy in this case, much the same as back pay or front pay is considered an equitable remedy even though both are also a form of monetary relief  *Cf. Dukes v. Wal-Mart, Inc.*, 474 F.3d 1214, 1237 (9th Cir. 2007) ("it is well-established that back pay is an equitable, make-whole remedy under Title VII"); *Kramer v. Logan County School District No. R-1*, 157 F.3d 620, (8th Cir. 1998) (holding that "front pay is not so much a monetary award for the salary that the employee would have received but for the discrimination, but rather the

(Fed.Cir. 2006).   Consequently, the order requiring that the FSA comply with the settlement agreement will include the payment of interest on the amounts required to be paid to bring the FSA into compliance.[20]

Generally speaking, the choice of the prejudgment interest rate and the method of calculation are in the discretion of the court.  *E.g., Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47,  55-56 (2nd Cir. 1998); *Forman v. Korean Air Lines Co., Ltd.*, 84 F.3d 446, 450 (D.C. Cir. 1996); *General Facilities v. National Marine Service*, 664 F.2d 672, 674 (8th Cir.1981).   Several circuit courts, however, have indicated a preference for use of the prime rate.  *First National Bank of Chicago v. Standard Bank & Trust*, 172 F.3d 472, 480 (7th Cir.1999); *Forman v. Korean Air Lines Co., Ltd.*, *supra*; *McKelvy v. Metal Container Corp.*, 854 F.2d 448, 454 (11th Cir.1988) (IRS prime rate).   In fact, the Seventh Circuit has taken the position that use of something other than the prime rate is an abuse of discretion unless the district court has entered into a more sophisticated market analysis. *First National Bank of Chicago v. Standard Bank & Trust, supra; Lewis v. City of Chicago*, 2007

---

monetary equivalent of reinstatement, to be given in situations where reinstatement is impracticable or impossible"); *Allison v. Citgo Petroleum Corp.*, 1998 WL 244989 *10 (5th Cir. 1998); *Thurman v. Yellow Freight Systems, Inc.*, 97 F.3d 833, 835 (2nd Cir. 1996).

[20]   The Federal Circuit in *Kary* stated the following with respect to the court's power to tailor the form of specific performance to effectuate the purposes of the contract under the circumstances currently existing:

> The second remedy that the government agrees is available in this case is enforcement of the agreement. Enforcement by specific performance is intended to have "the same effect that the performance due under a contract would have produced." Restatement Second of Contracts § 357 cmt. a; *see also id.* at § 358(1) ("An order of specific performance ... will be so drawn as best to effectuate the purposes for which the contract was made."). We hold that the appropriate remedy in this case is specific performance. An order of specific performance does not have to order the exact performance contemplated by the contract. The order "will be so drawn as best to effectuate the purposes for which the contract was made and on such terms as justice requires. It need not be absolute in form and the performance that it requires need not be identical with that due under the contract." *Id.* § 358(1); *McFarland v. Gregory*, 322 F.2d 737, 739 (2d Cir.1963) ("In framing such a decree the performance that it requires need not be identical with that promised in the contract."). Rather, [t]he court should so mold its decree as best to effectuate the purposes for which the contract was made." 12 Margaret N. Kniffin, *Corbin on Contracts* § 1137 (Joseph M. Perillo ed., rev. ed.1993); *see also* Restatement (Second) of Contracts § 358 cmt. a (describing the goal of "assur[ing] the expectations of the parties").

WL 869559 *7 (N.D.Ill. 2007).  In contrast, courts in the Second Circuit  have expressed a preference for using the federal post-judgment rate. *Robinson v. Instructional Systems, Inc.*, 80 F. Supp. 2d 203, (S.D.N.Y. 2000).  And, still other courts have looked to the prejudgment interest rate allowed by state law.  *E.g., Hillman v. United States Postal Service*, 2001 WL 1448578 *5 (D.Kan. 2001).  Finally, several federal circuit courts have held that compound interest is the norm, at least for certain kinds of cases.  *E.g.*, *American National Fire Insurance Company, ex rel. Tabacalera Contreras Cigar Company v. Yellow Freight Systems, Inc.*, 325 F.3d 924, 937-938 (7th Cir. 2003); *Saulpaugh v. Monroe Community Hosp.*, 4 F.3d 134, 145 (2nd Cir. 1993) (holding that it was an abuse of discretion not to compound the award of prejudgment interest in a Title VII case).

In January 2002, when the second payment coming from NFC failed to include the additional amounts for back pay that the court concludes are owed to Kraft, the federal post-judgment rate was 2.24%, the prime rate was 4.75%, and the North Dakota prejudgment rate was 6%.[21]  Since that time, the prime rate has varied from a low of 4.0% to a high of 8.25%,[22] and the federal post-judgment rate has varied between 0.95% and 5.27%.[23]

The Eighth Circuit does not appear to have adopted a preferred approach to the award of prejudgment interest.  The court has said generally, however, that:  "Prejudgment interest serves at least two purposes: (1) it helps compensate plaintiffs for the true cost of money damages they have incurred, (2) where liability and the amount of damages are fairly certain, it promotes settlement and deters an attempt to benefit unfairly from an inherent delay of litigation."  *EEOC v. Rath Packing*

---

[21]  N.D.C.C. § 47-14-05 (interest on monetary obligations when another rate is not specified).

[22]  See http://www.federalreserve.gov.

[23]  See http://www.txnd.uscourts.gov.

*Co.*, 787 F.2d 318, 333 (8th Cir.1986) (*quoting General Facilities v. National Marine Service*, 664 F.2d at 674).

If this was a case where a party had violated Title VII, the court would be inclined to award the average of the prime rate for the period in question compounded annually.  But, since the award of prejudgment interest here is for the purpose of obtaining full compliance with the agreement, the court believes a more conservative rate of interest is appropriate and selects the rate of 4% per annum, simple interest without compounding.  Finally, because the check that should have included the amount of back pay that must now be paid was issued on or about January 7, 2002, the court will order that the prejudgment interest run from that date.

### 13.0

Kraft is the prevailing party in this action and is entitled to an award of costs, which, in this case, shall include an award of attorney's fees, since these are also permitted under Title VII when the United States is the defendant.  42 U.S.C. § 2000-5(k).  *Eatmon v. Bristol Steel & Iron Works, Inc.*, 769 F.2d at 1519 (awarding attorney's fees pursuant to Title VII for breach of an EEOC conciliation agreement); *Freeman v. Potter*, 2006 WL 2631722 *1-2 (W.D. Va. 2006) (awarding attorney's fees against the United States Postal Service pursuant to Title VII for beach of a  pre-decision settlement agreement).

### ORDER FOR JUDGMENT

Based on foregoing findings of fact and conclusions of law, the court hereby **ORDERS, ADJUDGES,** and **DECLARES** as follows:

1.  The USDA/FSA failed to fully comply with the provisions of the second settlement
agreement dated September 4, 2001, which, given the noncompliance provisions of

44

the agreement, entitles Kraft either to agency compliance with the agreement or reinstatement of her underlying federal civil rights claims. Under the particular circumstances of this case, requiring USDA/FSA's compliance is the more appropriate remedy assuming it is available and enforceable.

2.  As a result of the USDA/FSA's noncompliance with the second settlement agreement, the defendant shall do the following to bring the USDA/FSA into compliance:

   a.  Within thirty days correct Kraft's payroll records by cancelling all LWOP during the period from March 20, 2000, through November 3, 2000, to reflect the payment of salary for that period of time consistent with the court's order.

   b.  Within thirty days recalculate the amount of back pay required to be paid pursuant to the second settlement agreement for the period from October 10, 1999, through November 3, 1999, making sure that the correct salary figures (both pre-promotion and post-promotion) are used to make the calculation and including payment for the time that Kraft was on LWOP from March 20, 2000 through November 3, 2000.

   c.  Within forty-five days make payment to Kraft for the recalculated amount of back pay less, at the discretion of the defendant, (i) the amount previously paid for the period from October 10, 1999, through November 3, 2000, and (ii) any amounts paid for retirement disability for the period prior to and through November 3, 2000, plus interest on the net amount at the rate of 4% per annum, simple interest from January 7, 2002, to the date of payment.

d.     Within thirty days resubmit all of Kraft's payroll information to the OPM, corrected to reflect the promotion given by the second settlement agreement, including the information for both the period from March 30, 1997 through October 9, 1999, and the period from October 10, 1999 through November 3, 2000.  At the time of the submission of the information to the OPM, the defendant shall request from the OPM written confirmation of its receipt of the information along with an updated calculation of Kraft's disability annuity and within sixty days provide a copy of the same to Kraft and file a copy with the court.

e.     If for any reason the defendant is unable to comply with any aspect of this order within the time frame specified, the defendant shall file with the court a statement describing the good faith efforts made to comply and the reasons for the inability to comply, and the court will conduct such further hearings and issue such further orders as are necessary to carry out the intent of the court's order and judgment.

3.     The court retains jurisdiction to ensure compliance with court's order and judgment.

4.     As the prevailing party, Kraft is entitled to tax her costs and reasonable attorney's fees in accordance with the provisions of Local Rule 54.1(C).

5.     The court's orders as set forth above are stayed for a period of sixty days from the date of entry of judgment to allow the defendant time to make a decision regarding appeal and, to the extent necessary, move for a stay pending appeal.

6.      The clerk is instructed to enter judgment in accordance with this declaration and

order.

Dated this 31st day of July, 2007.


/s/ Charles S. Miller, Jr.
Charles S. Miller, Jr.
United States Magistrate Judge